O'BRIEN et al. v. WHEELOCK et al.

(Circuit Court of Appeals, Seventh Circuit. June 6, 1899.)

No. 431.

1. FEDERAL COURTS—FOLLOWING STATE DECISIONS—CONSTRUCTION OF STATE LAWS.

While the federal courts, in causes within their jurisdiction involving rights arising under state statutes which had not at the time received an authoritative construction by the state courts, or the validity of which had not been adjudicated, are not bound to follow a subsequent state decision as to such construction or validity, yet, in exercising its independent judgment thereon, a federal court should give effect to rules of construction which had previously been established by the highest court of the state, and should also lean towards an agreement of views with the state court, and not act upon a different view, unless compelled to do so to prevent an absolute denial of justice. Such considerations have peculiar weight when the question to be determined relates to the jurisdiction or power, under the constitution of the state, of tribunals or bodies created by legislative enactment, and charged with the performance of public duties, such as the making of special assessments on private property.[1]

2. ILLINOIS DRAIN AND DITCH STATUTE OF 1871—CONSTITUTIONALITY—VALIDITY OF ASSESSMENTS.

Article 9, § 5, of the constitution of Illinois of 1848, provided, "The corporate authorities of counties, townships, school districts, cities, towns and villages may be vested with power to assess and collect taxes for corporate purposes." The supreme court of the state, in numerous decisions, held that such provision was restrictive in its nature, and that the legislature could not constitutionally confer the power to tax upon any other bodies than the corporate authorities named in the provision. The constitution of 1870 contained a similar provision (article 9, § 9), with an additional clause that "the general assembly may vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessments or by special taxation of contiguous property or otherwise." Held that, applying to such provision the settled rule of construction of the state, by necessary implication the legislature was inhibited from conferring power to make special assessments except upon the authorities of "cities, towns or villages," and that the act of April 24, 1871 (Laws 1871-72, pp. 356-365), "To provide for the construction and protection of drains, ditches, levees and other works," and authorizing the

---

[1] See note to Wilson v. Perrin, 11 C. C. A. 71, and Hill v. Hite, 29 C. C. A. 553.

cost thereof to be assessed on property benefited, by juries appointed by county courts, the assessments to be confirmed by such courts, was in violation of the constitutional restriction, and assessments made thereunder are not enforceable.

3. MUNICIPAL BONDS—ISSUE UNDER INVALID STATUTE—EQUITABLE LIEN.

The fact alone that landowners advocated and used their influence to secure the passage of a law under which bonds were issued, to be paid by special assessments against their lands, which law was subsequently declared unconstitutional, and the assessments void, does not afford ground on which a court of equity can declare a lien upon such lands in favor of the bondholders, in the absence of fraud, and where both the landowners and the purchasers of the bonds acted in the mistaken belief that the law was valid.

4. SAME.

Where bonds issued by commissioners, appointed by a court, in payment for the construction of a levee to protect lands from overflow, were void because their issuance and the creation of the indebtedness by the commissioners was without authority of law, and contrary to the public policy of the state, as declared by its constitution, a court of equity has no power to determine that certain lands received the benefit of the expenditure, and on that ground to declare a lien thereon in favor of the bondholders.

Appeal from the Circuit Court of the United States for the Southern District of Illinois.

Henry M. Duffield, for appellants.

Thomas Worthington, Benjamin Harrison, and A. G. Crawford, for appellees.

Before HARLAN, Circuit Justice,[2] and WOODS, Circuit Judge.

HARLAN, Circuit Justice.    This case relates to certain proceedings under an act of the general assembly of Illinois approved April 24, 1871, entitled "An act to provide for the construction and protection of drains, ditches, levees and other works."

The principal question is whether the lands of the appellees, who were the defendants below, and who numbered about 1,000, are liable for assessments that were made under that act to pay certain bonds issued many years ago to contractors, which were purchased by Francis Palms, and are now held by his executors.

It is contended that the act was in violation of the constitution of Illinois as it then was, and as interpreted by the supreme court of that state, and that the bonds in question were void because issued in violation of law.

It is insisted on the other hand that the decisions of the state court do not go to the full extent asserted by the defendants, and that, if they did, the question of the constitutionality of the act of 1871, and the validity of the bonds issued under it, is one upon which this court is bound to exercise its independent judgment.

It is also insisted by the appellants, who were the plaintiffs below, that, even if the bonds were issued without the sanction of a valid enactment, the lands of the defendants are, under the circumstances disclosed by the record, liable for the amount of the assessments made against them for the payment of the bonds held by the plaintiffs.

[2] Mr. Justice Harlan sat in this court under special assignment, made in conformity with section 617, Rev. St.

The plaintiffs, in support of their claim, rely upon certain orders made in the court below in a suit instituted by Palms in his lifetime against the commissioners appointed under the act of 1871, and under whose direction the bonds were issued. The defendants insist that their rights were not affected by the orders made in that suit. The defendants further insist that the long time that elapsed after the last of those orders were made, before the institution of the present suit, shows such laches upon the part of the plaintiffs as precludes a court of equity from giving them relief, independently of any other question in the case.

This litigation is of such a character, and the questions pressed upon the attention of the court are so numerous, that a somewhat extended statement of the facts disclosed by the record is necessary, in order to bring out clearly the grounds upon which, in our judgment, the determination of the cause must rest. When that is made, little need be said in order to dispose of the case.

By the above act of the general assembly of Illinois, it was provided that whenever one or more owners or occupants of lands desired to construct—

"A drain or drains, ditch or ditches, across the lands of others, for agricultural and sanitary purposes, such person or persons may file a petition in the county court of the county in which the drain or drains, ditch or ditches, shall be proposed to be constructed, setting forth the necessity of the same, with a description of its or their proposed starting point, route and terminus, and if it shall be deemed necessary for the drainage of the land of such petitioners that a levee or other work be constructed, the petitioners shall so state, and set forth a general description of the same as proposed, and may pray for the appointment of commissioners for the construction of such work, pursuant to the provisions of this chapter." Section 1.

The act required notice by publication to be given of any petition filed under its provisions, and that:

"Such notice shall state when and in what court the petition is filed, the starting point, route and terminus of the proposed drain or drains, ditch or ditches, or levees, and if a levee or other work is intended to be constructed in connection therewith, shall so state, and at what term of court the petitioners will ask a hearing upon such petition." Section 2.

If the drain or drains, ditch or ditches, levee or other work proposed to be constructed, was to pass through or over, or be constructed upon, lands lying in different counties, the petition could be filed in the county court of either county. Section 4.

The court in which the petition was filed was empowered to determine all matters pertaining to the subject-matter of the petition.

If it appeared that the proposed drain or drains, ditch or ditches, levee or other work, was necessary or would be useful for the drainage of the lands for agricultural and sanitary purposes, the court was required to so find, and appoint three competent persons as commissioners to lay out and construct such proposed work. Section 5.

It was made the duty of the commissioners to examine the lands proposed to be drained, and those over or upon which the work was proposed to be constructed, and determine:

"(1) Whether the starting point, route and terminus of the proposed drain or drains, ditch or ditches, and if a levee or other work is proposed, the proposed location thereof, is or are in all respects proper or most feasible, and if not,

what is or are so; (2) the probable cost of the proposed work, including all incidental expenses, and the expenses of the proceeding therefor; (3) what lands will be injured thereby, and the probable aggregate amount of all damages such lands will sustain by reason of the laying out and construction of the proposed work; (4) what lands will be benefited by the construction of the proposed work, and whether the aggregate amount of benefits will equal or exceed the costs of constructing such work, including all incidental expenses and costs of the proceeding." Section 9.

If the commissioners found and reported that the expense would more than equal the benefits, the proceedings were to be dismissed; if less, then they were to have plans, profiles, surveys, and specifications made, and report the same to the court. Sections 10, 11.

The commissioners were not confined to the point of commencement, route, or terminus of the drains or ditches, or to the number, extent, or size of the same, or the location, plan, or extent of any levee or other work, as indicated in the petition. But they were directed to locate, design, lay out, and plan the same as they thought would drain the petitioners' land with the least drainage, and for the greatest benefit of all the lands to be affected thereby. All plans proposed by the commissioners could be changed by the court on the application by them or by any person interested. Section 12.

The act required due notice by publication to be given of any application to confirm the report, and the privilege was given to all persons interested to appear and contest its confirmation, or to ask any modification thereof. If no objections were made to the report, or if the objections made to it were not well taken, it was to be confirmed. If the court was of opinion that the report should be modified, it was given authority to make such modification as would be equitable. Sections 13, 14.

If the report was confirmed, then the court was authorized to impanel a jury of 12 men competent to serve as jurors, who, being duly sworn, were required to assess damages and benefits according to law; or the court could direct that a jury be impaneled before a justice of the peace for the assessment of damages and benefits, in which case the commissioners could apply to any justice of the peace in the county, who should immediately, without the formality of any written application, proceed to summon and impanel a jury of 6 men competent to serve as jurors, who should be sworn in the same manner as was provided in case of a jury impaneled by the court in which the proceeding is pending,—the justice to enter upon his docket a minute of such proceeding before him, and the names of the jurors. Section 16.

The duty of the jury was to examine the land to be affected by the proposed work; ascertain to the best of their ability and judgment the damages and benefits sustained by or accruing to the land affected by the construction of the proposed work; make out an assessment roll, in which should be set down in proper columns the names of owners, when known, a description of the premises affected, in words or figures, or both, as was most convenient, the number of acres in each tract, and, if damages were allowed, the amount of the same; and in case damages were allowed to, and benefits assessed against, the same tract of land, the balance, if any,

should be carried forward to a separate column for damages or benefits, as the case might be. Section 17.

In making the assessment the jury were required to award and assess damages and benefits in favor of and against each tract of land separately, in the proportion in which such tract of land would be damaged or benefited; and in no case should any tract of land be assessed for benefits in a greater amount than its proportionate share of the estimated cost of the work and expenses of the proceeding, nor in a greater amount than it would be benefited by the proposed work, according to the best judgment of the jury. Section 18.

The commissioners, or any person who made objection to the assessment, were given the right of appeal from the finding of the jury. If, upon such appeal, there were corrections of the assessment, or if the assessment roll was confirmed, then the roll was to be spread upon the record, with right of appeal or writ of error therefrom. Sections 24, 26.

At the time of confirming the assessment the court could order the assessment of benefits to be paid in installments of such amounts and at such times as would be convenient for the accomplishment of the proposed work; otherwise, the whole amount should be payable immediately upon the confirmation, and should be "a lien upon the lands assessed until paid." Section 27.

It was made the duty of the clerk, immediately after the entry of the order of confirmation, to make out and certify to the commissioners a copy of the assessment roll, and also to make out and deliver to the commissioners separate copies of the same, pertaining to the lands situated in different counties, to be recorded in the recorder's office of the respective counties in which the lands were situated, and which should be notice of the lien thereon to all persons. Section 28.

Upon receiving a certified copy of such assessment, the commissioners could proceed to collect the same, or any installment thereof, or certify the assessment of any installment thereof which they might be entitled to collect at the time to the county clerk of the county in which the lands assessed were situated, who was required to "extend the same, in a separate column, upon the proper tax books for the collection of state and county taxes: provided, the owner, agent or occupant of any land through or on which any drain, ditch or levee shall be constructed shall have the right, under the direction of said commissioners, within such time as they shall prescribe, to construct such drain, ditch or levee, or any part thereof, at his own cost; and in case he shall so construct the same, he shall be allowed for the value thereof upon his assessment." Section 29.

In case the assessment for benefits should be payable in installments, such installments were to draw interest at the rate of 10 per cent. per annum from the time they became payable till they were paid, and the interest could be collected and enforced as part of the assessment. Section 30.

Other sections of the act are as follows:

"Sec. 31. When the commissioners shall have elected to collect any assessment or installment thereof themselves, or shall not have caused the same to

be extended upon the state and county tax books, and any assessment or instalment shall be due and uncollected, and as often as any instalment shall become due and be uncollected at the time for making return of the tax books for the collection of state and county taxes next succeeding the time of the receipt of the certified copy of the assessment by the commissioners, or the falling due of any instalment, the commissioners may return a certified list of such delinquent lands, with the amount due thereon, to the officer who shall be authorized by law to receive the return of the books for the collection of state and county taxes in the counties or respective counties where the lands are situated, who shall proceed to collect and enforce the same in the same manner as other taxes or special assessments are enforced, and shall pay over the amount so collected to the commissioners."

"Sec. 34. The commissioners, when appointed and qualified pursuant to this chapter, may do any and all acts that may be necessary in and about the surveying, laying out, constructing, repairing, altering, enlarging, cleaning, protecting and maintaining any drain, ditch, levee or other work for which they shall have been appointed, including all necessary bridges, crossings, embankments, protections, dams and side drains, and may employ all necessary agents and servants, and enter into all necessary contracts, and sue and be sued.

"Sec. 35. The commissioners may borrow money, not exceeding in amount the amount of assessment unpaid at the time of borrowing, for the construction of any work which they shall be authorized to construct, and may secure the same by notes or bonds, bearing interest at a rate not exceeding ten per centum per annum, and not running beyond one year after the last assessment on account of which the money is borrowed shall fall due, which notes or bonds shall not be held to make the commissioners personally liable for the money borrowed, but shall constitute a lien upon the assessment for the repayment of the principal and interest thereof."

"Sec. 37. All damages over and above the benefits to any tract of land shall be payable out of all the amounts assessed against other lands for benefits, and shall be paid or tendered to the owner thereof before the commissioners shall be authorized to enter upon his land for the construction of any work thereon. In case the owner is unknown, or there shall be a contest in regard to the ownership of the land, or the commissioners cannot, for any reason, safely pay the same to the owner, they may deposit the same with the clerk of the court, and the court may order the payment thereof to such party as shall appear to be entitled to the same."

"Sec. 45. Any person who shall wrongfully and purposely fill up, cut, injure, destroy or in any manner impair the usefulness of any drain, ditch or other work constructed under this chapter, or that may have been heretofore constructed, for the purposes of drainage or protection against overflow, may be fined in any sum not exceeding two hundred dollars, to be recovered before a justice of the peace in the proper county; or if the injury be to a levee, whereby lands shall be overflowed, he may, on conviction in any court of competent jurisdiction, be fined in any sum not exceeding five thousand dollars, or imprisoned in the county jail not exceeding one year, or both, in the discretion of the court. All complaints under this section shall be in the name of the people of the state of Illinois, and all fines when collected shall be paid over to the proper commissioners, to be used for the work so injured.

"Sec. 46. In addition to the penalties provided in the preceding section, the person so wrongfully and purposely filling up, cutting, injuring, destroying or impairing the usefulness of any such drain, ditch, levee or other work, shall be liable to the commissioners having charge thereof for all damages occasioned to such work, and to the owners and occupants of lands for all damages that may result to them by such wrongful act, which may be recovered before a justice of the peace, if within his jurisdiction, or before any court of competent jurisdiction." Laws Ill. 1871-72, pp. 356-365.

Proceeding under the above act, numerous owners and occupants of the lands known at the time as the "Mississippi Bottom Lands," in the counties of Adams, Pike, and Calhoun, Ill., filed a petition in the county court of Pike county, expressing their desire to construct

drains and ditches, and also a levee and other works, across the lands of others in that bottom, for agricultural and sanitary purposes, so as to reclaim the bottom land from overflow by the waters of that river, "in order to make the location salubrious, and render the soil available for tillage, and otherwise develop the agricultural resources of said bottom land." They represented that—

"Said bottom land has been from time immemorial, and now is, a low and nearly level tract of land formed by deposits of alluvion from said river; that it is traversed throughout nearly its entire length by a slough or bayou known as the 'Sny Cartee Slough'; that said bottom land is also variously intersected by other and smaller sloughs, some of which are short channels putting out from the river and returning thereto, while others start from and return to the said Sny Cartee slough, and others are, again, lateral branches connecting said Sny Cartee slough with the river; that the said bottom land is below the level of the high-water mark of said river, and absolutely without protection therefrom; that the greater part thereof is nearly every year inundated by the waters of said river, and all are subject to inundation, and have been repeatedly submerged by said overflow, the river on such occasions being a stream from about four to eight miles wide, and running from bluff to bluff on either side"; "that, by reason of said exposure to overflow, the mass of the said bottom land has been allowed to remain in its primitive condition, and will so remain unless reclaimed; that it is but sparsely populated, and that the occupants thereof support themselves almost exclusively by the cultivation of the soil; that they are every year greatly embarrassed in putting in their crops by the peculiar character of the rise in said river, which has no regular time for reaching its maximum height, nor any fixed number of rises during a season; that their crops when planted are frequently destroyed by an unexpected rise in said river, and in such cases they are either compelled to replant their crops, or the crops are destroyed so late in the year as to render the operations of the season a total failure"; "that upon the subsiding of the waters the said bottom land is left in a wet and marshy condition, so that the stagnant water is left on various parts of its surface, and the succeeding heat of summer and autumn evolve therefrom malaria and disease"; "that by reason of said facts said bottom land not only now remains sparsely populated, while the territory around it is thickly settled, but the same is practically incapable of supporting any further population, so that the average taxable value of the lands now subject to overflow is no more than about fifty cents per acre, and the present occupants of said bottom lands have been in most cases induced to remain solely by the prospect of the ultimate reclamation of said land,—a consummation which has been the theme of their enterprise and endeavor ever since the settlement of the bottom lands described."

The petitioners called the attention of the court to the act of 1871, and asked the appointment of commissioners, in accordance with the provisions of that law—

"For the purpose of constructing a levee on the Mississippi river, from a point on said river at or near the head of the Sny Cartee, in the county of Adams and state of Illinois, and thence in a southerly direction along or near the east bank of the Mississippi river, as shall be deemed advisable for the safety of the proposed work, to a point at or near the mouth of Hamburg Bay, in the county of Calhoun, state of Illinois, and to do and perform any and all acts, as provided in said law, for the surveying, laying out, and constructing, altering, repairing, enlarging, protecting, and maintaining, said proposed levee, or to render it efficient for the protection and reclamation of the lands lying east of the said levee, and between it and the bluffs, and now subject to overflow by the Mississippi river and other streams."

After asking a confirmation of the report of the commissioners if they found and reported that the proposed levee could be constructed at a cost not exceeding $5 per acre for all lands benefited and reclaimed from overflow, the petitioners prayed:

"That the assessment for benefits upon the property to be affected by the construction of said work shall be paid in ten equal annual installments, the first installment being due and payable three years after the date of the commissioners' report and the filings of the plans and specifications with the court, and one-tenth of such assessment, with accrued and accruing interest, each year thereafter, until the whole amount shall have been paid."

The county court of Pike county, having found that the proposed work was necessary, appointed, in 1871, William Dustin, George W. Jones, and John G. Wheelock commissioners, and they duly qualified and acted in that capacity. In the same year the commissioners reported the result of their examination, and in their report indicated, by map and profiles, the work to be done. The report was confirmed without objection, and a jury of 12 was organized to assess damages and benefits, and make an assessment roll. The assessments were made and put upon the record of the court. Certified copies of the assessments were recorded in Pike, Adams, and Calhoun counties. An order was made requiring the assessments to be paid in ten annual installments, with interest from October, 1872.

In conformity with the order of the court, the commissioners issued bonds from time to time, upon estimates made by the engineer as the work progressed, to be used in the construction and completion of the work. They were delivered directly to the contractors as they were earned. The first issue of bonds amounted to $499,-500, of which Francis Palms purchased $202,500. A second issue was made, amounting to $148,500, which were also purchased by him. That issue was the result of a second petition under the act of 1871, proceedings under which resulted in further assessments.

It may be here stated that by an act of the general assembly of Illinois approved April 9, 1872, it was provided that whenever it appeared by the findings of the court before which proceedings were pending or might be had, under the act of April 24, 1871, that any drain, ditch, levee, or other work authorized by that act to be made would be of public benefit for the promotion of the public health, or in reclaiming or draining lands, the same should be deemed "a public work," and that it should be lawful for the commissioners appointed under the act of 1871 to register at the office of the auditor of public accounts any bonds issued by them under order of court; such registration to show the date, amount, number, maturity, and rate of interest of the bonds, and the fact of such registration to be certified by the auditor, under his seal of office, upon each bond. The act contained other provisions, but it is not necessary to refer to them.

All of the bonds issued by the commissioners were in the same form. We give here a copy of one of them, issued in 1872:

"No. 6.                    United States of America.                    $500.

Sny Island Levee Bond.

"State of          (Ten Per Cent. Interest Bond.)          Illinois.

"The commissioners appointed by the county court of Pike county and state of Illinois, on the petition of John Morris and others, to locate and construct a levee on the Mississippi river, in the counties of Adams, Pike, and Calhoun, by virtue of an act of the general assembly of the state of Illinois entitled 'An act to provide for the construction and protection of drains, ditches, levees

and other works,' and by power vested in them by said act, acknowledge themselves, as such commissioners, held and firmly bound unto John G. Wheelock or bearer in the sum of five hundred dollars, lawful money of the United States, payable in the city of New York, at the bank or agency used by the treasurer of the state of Illinois, on the first day of October A. D. 1882, with interest at the rate of ten per cent. per annum; interest payable on the first day of July in each year, on the surrender of annexed coupons as severally due.

"This bond is one of a series of five hundred thousand dollars issued for the purpose aforesaid, and after an order of the county court of Pike county aforesaid approving of the assessment made by a jury of the cost of said levee.

"In witness whereof, the said commissioners," etc.

Annual interest coupons, payable to bearer, were attached to each bond.

On each bond was indorsed a certificate in these words:

"Auditor's Office, Illinois.

"Springfield, Nov. 12th, 1872.

"I, Charles E. Lippincott, auditor of public accounts of the state of Illinois, do hereby certify that the within bond has been registered in this office this day pursuant to the provisions of an act entitled 'An act to provide for the registration of drainage and levee bonds, and secure the payment of the same,' approved April 9th, 1872, and in force July 1st, 1872.

"In testimony whereof," etc.

At the January term, 1876, of the supreme court of Illinois, the case of Updike v. Wright, 81 Ill. 49, was decided. That case involved, among other questions, the constitutionality of the above act of April 24, 1871, providing for the construction and protection of drains, ditches, levees, and other works. The case related to certain proceedings taken for the construction of a levee on the banks of the Wabash river. The representation to the county court was that the lands of the petitioners were subject to overflow from that river, that their fences and crops were liable to be swept away and destroyed by such overflow, and that the same could be prevented by an earthwork levee.

After observing that the above act of 1871 was evidently passed in view of article 4, § 31, of the Illinois constitution of 1870, declaring that "the general assembly may pass laws permitting the owners or occupants of lands to construct drains and ditches for agricultural and sanitary purposes across the lands of others," Chief Justice Scott, delivering the unanimous judgment of the court, said:

"Apparently, an effort was made to have the law enacted conform to the constitutional provisions in every particular. Hence it is declared the work to be done is the construction of drains and ditches for agricultural and sanitary purposes, and if it becomes necessary, in the construction of a system of drainage, that a 'levee or other work' be adopted to make that system available, such levee or other work may be constructed under the provisions of the statute. But it is nowhere intimated the owners or occupants of land may undertake, under the provisions of this law, the building and maintenance of an immense levee on the borders of a river, not connected with any system of drainage by ditches. Neither the constitution nor the statute contemplates any such work. What was in the minds of the framers of the constitution, and the legislators who enacted the law in pursuance of its provisions, must have been the drainage of lands by means of drains and ditches, and what is said in the statute on the subject of a 'levee or other work' is always in connection with a system of drainage in that mode. The work outlined by the constitution and the statute is comparatively insignificant, and may be done at no great cost; but that which is undertaken in this case is the construction

of a levee on the banks of the Wabash river, of many miles in length, and estimated to cost a great many thousand dollars. No system of drainage by drains and ditches was planned, nor deemed necessary for agricultural and sanitary purposes. The representation to the county court is, the lands of the petitioners are subject to overflow from the Wabash river, that their fences and crops are liable to be swept away and destroyed by such overflow, and that the same can be prevented by an earthwork levee. The undertaking is one of great magnitude, and will require the expenditure of large sums of money. The assessment on complainant's land is over $10,000. And the allegation in the bill is that, unless all further assessments proposed to be made be arrested, the levee will cost more than the land is worth. Any construction of the statute that would warrant the owners or occupants of lands to enter upon such an immense and costly work seems forced and unreasonable. It is only in connection with drainage for agricultural and sanitary purposes that 'levees or other works' may be undertaken, as auxiliary to the drainage of the lands. Our opinion is, this is the only construction the statute will bear, consistently with the constitution; otherwise, one owner, whose lands are subject to overflow at certain seasons of the year from a river, could set in motion the proceedings for the erection of a levee sufficient to protect his lands, no matter how expensive, and have the cost levied upon the lands of others in the vicinity which commissioners appointed by the court might deem benefited by the improvement. Such a work cannot be said to be draining lands by drains and ditches over the lands of others; nor is such a levee, in any just sense, in the language of the statute, 'necessary to the drainage of the lands.' The work of constructing a great levee along the banks of a river subject to overflow, which defendants are about to do, is not embraced within the provisions of the statute, and is therefore without authority of enabling law."

But the court proceeded to observe that the decision could be placed on the ground that the general assembly possessed no power under the constitution to vest the commissioners or juries selected, or the county court, with authority to assess and collect taxes or special assessments for the contemplated improvement. It said:

"Section 5, art. 9, of the constitution of 1848, which declared 'the corporate authorities of counties, townships, school districts, cities, towns and villages may be vested with power to assess and collect taxes for corporate purposes, such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same,' was always construed by the decisions of this court as a limitation upon the power of the general assembly to grant the right to assess and collect taxes to any other than the corporate or local authorities of the municipalities or districts to be taxed. Board v. Houston, 71 Ill. 318; Harward v. Drainage Co., 51 Ill. 130; People v. Salomon, Id. 37; Gage v. Graham, 57 Ill. 144; Hessler v. Commissioners, 53 Ill. 105. It was also held that power in the legislature was subject to the further limitation that a local burden of taxation or special assessments could not be imposed upon a locality without the consent of the taxpayers to be affected. That section of the constitution of 1870 upon this subject provides: 'The general assembly may vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessments, or by special taxation of contiguous property, or otherwise. For all other corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes, but such taxes shall be uniform in respect to persons and property within the jurisdiction of the body imposing the same.' The clause in the present constitution, like that in the constitution of 1848, must be construed as a limitation on the power of the legislature. Giving it that construction, the general assembly can only vest cities, towns, and villages with power to make local improvements by special assessments or special taxation upon contiguous property benefited by such improvement. By necessary implication, it is inhibited from conferring that power upon other municipal corporations or upon private corporations. Only cities, towns, and villages are within the constitutional provisions; and, although other municipal cor-

porations may be vested with power to assess and collect taxes for corporate purposes, the limitation is absolute,—such taxes shall be uniform in respect to persons and property within the jurisdiction imposing the same. With equal propriety, this clause of the present constitution must be regarded as restricting the general assembly in conferring the power to levy and collect taxes, either general or special, to the mode and manner therein indicated. We do not understand the legislature possesses plenary power, unlimited and unrestricted, to invest whomsoever it may choose with authority to assess and collect either special assessments or taxes for every conceivable purpose. As we have seen, only cities, towns, and villages may levy special assessments or special taxation for local improvements, and all other municipalities can only be vested with jurisdiction to assess and collect taxes for corporate purposes; and that, too, under the positive inhibition such taxes shall be uniform in respect to persons and property. It would seem, therefore, to follow, as a corollary from the propositions stated, that neither the commissioners nor the juries selected, nor the county court, is such a body as, under the constitution, may be given power to make local improvements by special assessments or by special taxation upon contiguous property. There is still another consideration that has an important bearing upon the decision of the case. The clause of the constitution we have been considering, like that in the constitution of 1848, must be understood, in the light of the decisions of this court, as forbidding the general assembly from imposing a burden by taxation upon any locality without the consent of the citizens affected. Under this law, the people whose property is subject to taxation or assessments have never given any consent to it, if we exclude those who may have signed the petition addressed to the county court. No opportunity was afforded them to do so, nor does the law make any provision for submitting the question to a vote, to ascertain the will of those whose property is subjected to this local burden. It is imposed upon them under the statute, by the decision of the county court. Obviously, that section of the constitution that declares 'the general assembly may pass laws permitting the owners or occupants of lands to construct drains or ditches, for agricultural and sanitary purposes,' implies that the community whose property is to be taxed may have the right of election in the matter; otherwise, an onerous burden may be imposed upon them, without their consent, and such proceedings might be had as would result in the deprivation of property. How can the landowners be permitted to construct drains and ditches, unless some election is guarantied to them? The language employed implies voluntary action. Illustration will make the inconsistency of the present law apparent. For example, the privilege is given to any occupant, as well as the owner of land, of presenting a petition to the county court. Should the construction contended for prevail, a tenant residing upon land adjacent to a river subject to overflow might present a petition; and, under the decision of the court, the work of erecting a levee miles in length, and costing large sums of money, might be entered upon, and the expenses assessed upon the property in proximity to the river that might in any degree be deemed benefited. An intention to confer such unwarranted power upon one man, who would himself be subject to none of the burdens imposed, ought not to be imputed to the legislature. Any laws not permitting an election as to the propriety of undertaking the work are vicious, and within the inhibition of the constitution. It does not militate against this construction that the landowner may appear before the county court when the petition is presented, and resist the application, or may contest the assessment upon his property when made. Whether the contemplated work shall be undertaken, and his property subjected to taxation, is not made to depend upon his election, but upon the decision of the court. It would be a solecism to call that privilege an 'election.' ''

At the same term of the court, the case of Webster v. People (unreported) was decided. That case related to the above work undertaken under the authority of the county court of Pike county. The efforts of the commissioners to collect installments of interest on the assessments were resisted by certain landowners. The supreme court of Illinois said:

"The principal questions raised and discussed in this case are the same as in Updike v. Wright, decided at the present term, and for an expression of our views reference is made to the opinion in that case. For the reasons there given, the judgment in this case will be reversed, and the cause remanded."

It may be well to state in this connection that the supreme court of the United States, in Harter v. Kernochan, 103 U. S. 562, 570, referring to section 5, art. 9, of the Illinois constitution, declaring that the corporate authorities of counties, townships, school districts, cities, towns, and villages may be vested with power to assess and collect taxes for corporate purposes, has said:

"It is the settled law of the state, as heretofore recognized by this court, that this constitutional provision was intended to define the class of persons to whom the right of taxation might be granted, and the purposes for which it might be exercised. and that the legislature could not constitutionally confer that power upon any other than corporate authorities of counties, townships, school districts, cities, towns, and villages, or for any other than corporate purposes." See, also, Livingston Co. v. Darlington, 101 U. S. 411; Weightman v. Clark, 103 U. S. 256, 259.

After the above decision in Webster v. People, certain landowners undertook to provide for the protection of their lands from overflow by the execution of deeds of trust to the commissioners. Under these deeds as much, perhaps, as $30,000 was raised and expended by the commissioners.

In May, 1878, while those deeds were in force, Palms, on behalf of himself and others, instituted a suit in equity in the circuit court of the United States for the Southern district of Illinois against the levee commissioners. The bill in that case recited the above legislation, and the proceedings resulting in the appointment of the commissioners, the assessments by the jury, and the issuing of bonds by the commissioners, and charged that the expense of the work was paid by the commissioners with money furnished by Palms and others, of which, it was alleged, the owners and occupants of the lands benefited and assessed were at the time well aware. Referring to the twenty-ninth section of the act of 1871, prescribing the duties of the commissioners, and also to the above act of 1872, that bill alleged that the commissioners made efforts—

"To collect the amount of some of the installments of said assessments, and the interest thereon, but the courts of the state of Illinois, before whom the question of the collection of such assessments and the installments thereof under said statutes was brought, refused to give effect to the provisions of said acts, so far as they purported to authorize the collection of the same by the collectors of taxes under extensions on the tax books; and no means are left for the collection of such assessments and interest, except such as may be supplied by the general authority of the courts that have jurisdiction of such questions. And your orator would further show unto your honors that the whole amount of the moneys advanced by him, and by other purchasers of the bonds, with interest thereon, remains unpaid, and that said commissioners remain and continue in the actual use and possession of the said levee and other works constructed with the moneys borrowed of your orator and others by the said commissioners, under the proceedings aforesaid, and they do also, by and under the direction of the owners of said lands, keep and use the said works to protect their own lands, and the lands of the other owners and occupants, from overflow from said river. And your orator further shows unto your honors that the said commissioners refuse to pay to your orator and the other holders of said bonds the whole or any portion of their principal—money

loaned to them for the purposes aforesaid—or interest, and they also refuse to enforce the collection of said assessments on the several tracts of land described in said Exhibit A, or the interest thereon, as it is their duty to do, and the owners and occupants of said lands refuse to pay said assessments, or the interest thereon, so that the moneys loaned by your orator for the construction of said works is wholly lost, together with the interest thereon. And your orator would further show unto your honors that the owners and occupants of said lands are very numerous, as will appear by the lists of land and the names of the owners thereof, as stated and set forth in the said Exhibit A, and the names of many of them are unknown to your orator, but all of them reside in other of the states of the United States than the state of Michigan, the greater number of them are residents and citizens of the states of Illinois and Missouri, and that the said commissioners, John G. Wheelock, George W. Jones, and Benjamin F. Westlake, are citizens of the state of Illinois, and of the Southern district aforesaid."

The relief asked was a decree directing an account to be taken of—

"The moneys loaned and advanced" by Palms to the commissioners, "to be used by them in the purchase and acquisition of the lands required for the location and construction of the said levee and other works, and for the construction and the completion of the said levee and all the works and improvements connected therewith, together with interest thereon at the rate of ten per cent. per annum, according to the terms of said bonds and the coupons thereto attached": the amount due Palms being ascertained, then that such amount be adjudged a lien in favor of Palms "upon the said levee and other works, and the lands acquired, owned, and held by the said commissioners for the site of said levee, and all other improvements, and upon the said assessments upon all of the said lands described in the said Exhibit A, for the benefits to said lands afforded by the said levee and other works, and the interest thereon"; and that "the said commissioners proceed at once, under the order and direction of your honors, to collect such assessments upon all and every of said tracts of land and the interest that has, or that may hereafter, accrue thereon, or so much thereof, from time to time, as will be sufficient to pay the interest money or the principal, payable to your orators as the same falls due, or that it may please your honors to appoint one or more competent persons, as receiver or receivers, to take possession and charge of the said levee and other works, and manage and control the same, together with all the books, papers, and properties of said commissioners, and with authority to collect, under the order and direction of this honorable court, the said assessments, and interest thereon, as often and in such sums as may be sufficient to meet and satisfy the claims of your orators as aforesaid."

The commissioners answered in that case, insisting, among other things, that, the bonds in question having been registered with the auditor of public accounts under the act of 1872, they were not responsible for the failure to collect the money to pay interest, and were without any duty in respect to the said assessments. They referred to the fact that certain landowners had at all times opposed the proceedings instituted to assess their lands for benefits on account of the said levee, and refused to pay interest on assessments, in consequence whereof the township collector had returned nearly all the landowners involved in the proceedings as delinquents; that thereupon the county collector made application to the Pike county court to enforce said assessments against the delinquent lands; that some of the landowners opposing the assessments filed objections to judgment for such assessments, setting up that the law under which the assessments were imposed was unconstitutional; that the commissioners employed counsel to prosecute the application for judgment and for the collection of said assessments, and the county

court gave judgment against the lands; that the landowners appealed to the circuit court, which affirmed the judgment of the county court; that thereupon the landowners carried the case by appeal to the supreme court of the state, stipulating that one appeal should be decisive of all the assessments; that the commissioners themselves employed counsel in the argument of the case in the supreme court of the state, and said court decided adversely to the right to collect said assessments; and that such decision of the highest court of the state was decisive of any question of right on their part to enforce assessments. The case referred to by the commissioners in their answer was the above case of Webster v. People. The commissioners also averred that—

"As such commissioners they are not now, and never have been, in any actual possession of any part of said levee or other work, except for the purpose of constructing, maintaining, and repairing the same; that they have never had title to any portion of the said levee, as they are likewise advised and believe, on account of the unconstitutionality of the law under which said work was done; and that since said law was declared unconstitutional these respondents, as commissioners, have only exercised authority over said levee in warning parties against injuring said levee, but this was in their private capacity, at the request of a portion of the landowners, who supplied them with funds for that purpose, in whose behalf they have, in like private capacity, tried to keep said levee in repair."

On the 13th day of March, 1879, that cause was heard upon bill and answer in the circuit court of the United States. By that court it was adjudged and decreed—

"That the said defendants [the commissioners] take, retain, and hold the right of way, levee, and other works and property in question, and described in the pleadings, and keep, take care of, preserve, and protect the same, under the order and control of this court, for the benefit and on behalf of the complainant and all other parties interested therein, or who may hereafter be found to be interested in the same, in whole or in part."

It was further decreed—

"That the complainants and all other persons who may have loaned or advanced money to the defendants for the acquisition by those of the said right of way, or for the construction of the said levee and other works and property connected therewith, or who may be the holder of any of the bonds issued by said defendants to raise money for the purposes aforesaid, or to pay for such right of way or the construction of such levee and other works, or to pay any of the proper expenses connected therewith, who may come into this suit, contributing their proper proportion to the expenses thereof, have liberty to go before the master and produce these said bonds and coupons for interest thereon, and make proof of the amount due them of principal and interest on account of such loans, advances, and bonds; and the cause is referred to John A. Jones, master in chancery, for the purposes aforesaid, who will, upon the application of the complainants, or other persons who may come into the cause as complainants upon the terms hereinbefore prescribed, and reasonable notice to the defendants or their solicitors, proceed to take the proofs of the amounts due to the complainants, and allow parties who may have before that time come into the cause, and, after such proofs are taken, make a report to the court of the amounts found by him to be due each and any party who may appear before him, and the grounds and facts of his several findings and conclusion," and "that after the coming in of the master's report of the amount or amounts found by him to be due to the complainant or other persons who may come into the cause as aforesaid, and the approval of said report, and the determination and adjustment by the court of the amount or amounts due to the complainant or other persons who may come into the cause for moneys

advanced or loaned on bonds held as aforesaid, the said complainants or other persons have the liberty to exhibit and file their supplemental bill or bills against any or all the present or former owners of the said lands alleged in said bill to be benefited by the said levee and other works, or who have heretofore or who may now be in any way interested in the said levee and other works, or the lands benefited thereby, to compel them to contribute to the payment of the amount or amounts which may be found due to the said complainant or other persons as aforesaid, and for such other and further relief as they may be advised they are entitled to; and the court reserves all other questions of relief to the parties, and of the costs, to be considered hereafter. And the said complainant is at liberty to use the names of the defendants in any such proceeding by way of supplemental bill, if they are advised it is necessary to do so, upon rendering them a sufficient indemnity against all costs and expenses."

The master to whom the cause was referred to ascertain the amount of the several bonds and coupons made his report, showing the names of various persons, and the amount of bonds held by them, respectively. The amount reported as due to Francis Palms on the bonds held by him was $221,228.26. The total amount found due to him and certain parties who became co-plaintiffs with him in the cause was $304,908.26. In the decree confirming the master's report it was declared:

"And it is further ordered, adjudged, and decreed by the court that the said several sums of money so found to be due to the said complainants as aforesaid are a lien upon the assessments made under the order of the county court of Pike county, in the state of Illinois, upon the lands described in the bound book, Exhibit A, with complainant's bill, and upon the said lands, as provided in the twenty-seventh and thirty-seventh sections of an act of the general assembly of the state of Illinois entitled 'An act to provide for the construction and protection of drains, ditches, levees and other works,' approved April 24, 1871. And it further appearing to the court that the defendants, commissioners under the several orders of the county court of Pike county aforesaid, have no money in their hands for the payment of the amounts so found and adjudged to be due to the said several complainants, and it also appearing to the court from the allegations of the complainant's bill, and not denied by the said defendants in their answer thereto, that they have taken no steps for the collection of the assessments made upon said lands for the repayment of the moneys borrowed by them, and the bonds and coupons issued by them, it was ordered by the court that the complainants have the right and liberty to proceed in this court, in the name of the said defendants as complainants as such commissioners, or in their own names as complainants, against the lands described in the said Exhibit A, and the owners thereof, or such of such lands and the owners thereof, or other persons, and said commissioners, as they may be advised, are liable for or bound to pay the sums found to be due to the complainants as aforesaid, jointly or severally, by a bill or bills, original, supplemental, or otherwise, as they may be advised, for the recovery of the amounts found due them as aforesaid, and also for the costs of this suit."

It should be here stated that after the decision in Webster v. People, and after the institution by Palms of the suit in the circuit court of the United States, the following amendment to the constitution of Illinois was adopted:

"The general assembly of Illinois may pass laws permitting the owners of lands to construct drains, ditches and levees for agricultural, sanitary or mining purposes across the lands of others, and provide for the organization of drainage districts, and vest the corporate authority thereof with power to construct and maintain levees, drains and ditches, and to keep in repair all drains, ditches and levees heretofore constructed under the laws of this state by a special assessment upon the property benefited thereby." 1 Starr & C. Ann. St. Ill. p. 122.

95 F.—57

Subsequently the legislature of Illinois passed an act, which took effect May 29, 1879, entitled:

"An act to provide for the construction, reparation and protection of drains, ditches and levees across the lands of others for agricultural, sanitary and mining purposes, and to provide for the organization of drainage districts." 1 Starr & C. Ann. St. Ill. p. 919.

Some of the defendants in the present case made efforts to secure the passage of the act last referred to. That act provided for the formation of drainage districts, with authority, not only to construct drains, ditches, and levees for agricultural, sanitary, and mining purposes, but also to maintain and keep in repair any such drains, ditches, or levees "heretofore constructed under any law of this state"; and, in cases where a levee had been theretofore built "under any law of this state," the annual assessment for keeping the same in repair was made due and payable on the 1st of September annually.

Subsequently, on the 26th of January, 1880, some of the landowners whose lands were described and included in the original assessments and in the original bill filed by Palms instituted proceedings under the act of 1879. In their petition they described the route and terminus of the levee, alleging that the levee "was constructed, under the laws of Illinois then in force, in the counties of Adams, Pike, and Calhoun, for the years 1872, 1873, and 1874." They further alleged that, by proper repair and maintenance of the levee, the lands aforesaid (which are alleged to be part of the lands described in the original bill and in the present bill, amounting in the aggregate to about 90,000 acres) would be reclaimed and brought into cultivation; that, in addition, it would greatly improve the sanitary condition of the locality through which the levee passed; and that it was absolutely necessary for the health and proper drainage and protection of the said land that the levee be repaired as speedily as possible. They prayed that a drainage district, to be known as "Sny Island Levee Drainage District," be formed out of the lands subject to periodical overflow by the Mississippi river in the townships named, for the repair and maintenance of such levee, according to the statute; that commissioners be appointed under the act of 1879, with directions to do all acts provided in the law for repairing levees, ditches, and drains, through assessments to be ordered; and for other and further relief.

Such proceedings were had that the county court of Pike county duly created the Sny Island drainage district, and in 1880 it received the surrender of the levee from the original Sny levee commissioners, and now retains possession and control of the same.

Palms died on the 24th day of November, 1886,—more than six years after the last order made in the suit brought by him in the federal court.

The present suit was brought by his executors; the defendants herein being the surviving commissioners, Wheelock and Jones, and numerous individuals who own lands within the territory described in the proceedings instituted in the county court of Pike county under the act of 1871.

The bill proceeded upon the general ground that each tract of land in question was chargeable in equity with the amounts assessed against it under the act of 1871, with interest, and that the plaintiffs had a lien on each tract for such sums as had fallen due and might become due under such assessments. It alleged that each defendant owned or claimed one or more tracts (Exhibit A showing a description of the various tracts, and the names of the persons against whom the assessments were made); that each defendant who acquired title to any of the lands after the assessments of 1872 and 1873 did so with full knowledge of such assessments and the above issue of bonds, as well as of the fact that the plaintiffs had purchased the bonds, and that the levee was constructed with the proceeds thereof; that, with like notice and knowledge, each of the defendants had appropriated and used the levee for the protection of their lands, and continued so to do; that all the defendants named in Exhibit A participated in causing said bonds to be issued and sold, and the proceeds expended by actively soliciting the passage of the act of 1871; that before and at the passage of the act of 1871 the reclamation and protection of the lands described in that exhibit had been a subject of consideration and discussion among the owners and occupants of the same, as well as others, and it was understood by all parties interested in such lands that in order to reclaim and protect the same a statute was absolutely necessary, under the provisions of which the persons interested in the lands could be united and organized, and a common agency created, with authority to make all necessary plans, estimates, and contracts for the location of the levee, and to borrow money upon bonds or otherwise, to be secured by assessments or pledges of the lands benefited; that the defendants, through the agency of their co-defendant Charles M. Clark, had procured the passage of that statute, and caused its provisions to be made known to the people interested, and thereupon devised a plan for the organization of a corporation composed of persons interested in the lands, for the purpose of raising money to put the act into effect; that a large number of the defendants subscribed to the capital of that corporation in order to effect the objects of its creation; that other defendants purchased lands through such last-named landowners, with full notice of the equities of the plaintiffs; that all of the defendants who purchased after May 4, 1878, did so with full notice of said assessments, and that the same were unpaid, and also that said original suit in the federal court was pending; that certain other defendants participated in causing the said bonds to be issued and sold to the plaintiffs' testator, and the proceeds thereof to be expended in the construction of the levee, and in causing the said assessments to be made by assigning the original petition to the Pike county court in the year 1872; that certain other defendants purchased lands from other landowners who had joined in the petition, with full knowledge of what had previously taken place; that other defendants participated in procuring the bonds to be sold, and the proceeds to be expended as stated, and in causing said assessments, by signing on the 20th day of November, 1874, a petition for a second assessment under the act of 1871; and that

other defendants purchased from or through persons of the class last mentioned, with full knowledge of all the facts.

The plaintiffs also alleged that certain named defendants, after the above decision by the supreme court of Illinois, knowing the levee to be constructed with the plaintiffs' money, and having full notice of all the facts, executed to Jones, Wheelock, and Westlake deeds of trust; that said deeds were made for the purpose of defeating the claims of the plaintiffs, and it was stipulated between the trustees and the last-named defendants that no part of the funds collected by the former should ever be applied to the payment of any indebtedness created by or on account of the original levee; that said deeds of trust continued in force until 1887, when the same were canceled, said Jones, Wheelock, and Westlake having, it is alleged, devised another scheme for defeating the claim of the plaintiffs; and that certain other defendants purchased from defendants of the class last mentioned, with full notice of all the facts.

It was further alleged that after the decree of March 13, 1879, namely, on January 26, 1880, certain defendants named filed a petition in the county court of Pike county setting forth that they owned certain lands, and alleging that a certain levee (the one heretofore described) had been constructed under the laws of the state of Illinois; that said petition set forth the purposes for which the levee had been constructed; that the same was in bad repair; that, in the faith that the same would be properly constructed and repaired, they had expended large sums of money, had improved farms, and that all such improvements would be washed away, unless the levee should be repaired and kept up; and that the lands subject to overflow amounted to an aggregate of 90,000 acres. The bill set forth the substance of the petition, and the various steps taken, as already stated, for the formation of a new drainage district, to be known as the "Sny Island Levee Drainage District," and alleged that all the defendants so joining had full notice of all the facts and of the making of the assessments aforesaid; that certain other defendants purchased lands from the defendants of the class last mentioned, with notice of all the facts; that certain other named defendants, pursuant to the statute of Illinois approved May 29, 1879, were severally made parties to, and had notice of, all the proceedings for the organization of the Sny Island levee drainage district, as well as of the contents of the petition therefor, and were bound by such proceedings and the appropriation of the levee aforesaid; that certain other named defendants acquired title to said lands, or interests therein, after July 26, 1880, and were bound by said proceedings and the appropriation of said levee; that certain other defendants named were heirs at law and took title to portions of said lands from ancestors who took part in some or all of the aforesaid proceedings; that certain other defendants had acquired title to some of said lands by accepting deeds of conveyance expressly recognizing the lien of plaintiffs on said tracts; and that every one of the present defendants had full notice of the claims of plaintiffs and of the facts aforesaid; and that all of the defendants now appropriated said levee and

other works and refused to contribute anything to the payment of the plaintiffs.

The bill alleged that the Sny Island levee drainage district had every year made large assessments, and, contriving and intending to defeat the plaintiffs, had caused many of the tracts of land to be sold for nonpayment of such assessments (such sales, it was alleged, being merely colorable, as against the rights of the plaintiffs, and mere clouds on the title to said land); that before the construction of said levee the lands were wet, and not worth exceeding 50 cents per acre; that the average amount assessed against the lands for the cost of the levee was greatly in excess of the then value of the lands, but it was expected that the work would, when constructed, drain every tract, and so enhance the value of the same as to make the lands ample security for the money borrowed; that the plaintiffs, relying on this and on the assurances of the landowners and commissioners, purchased the bonds in question; and that the lands were enhanced in value by said expenditures until they became worth $25 per acre.

It was also alleged that, if the levee had been kept up, it would have afforded full protection, and would have caused the lands to have continued to be good security; that defendants had spent some money in repairing said work, but made such improvements and repairs so unskillfully that they were insufficient; and that by neglect of the defendants the lands had again become wet and overflowed, and were not now good security for the plaintiffs.

After stating that the defendants were, by reason of the matters and things set forth in the bill, bound to preserve, protect, improve, and repair the said levee and other works described, by sufficient contribution in money, ratably or otherwise, and by further assessments upon the lands, in order to protect and keep the security of the plaintiffs adequate and sufficient, the plaintiffs prayed that by the appointment of a receiver with ample powers, and by other appropriate order, the defendants should be compelled to preserve, protect, repair, improve, and make said levee and other works protective of said lands, "or to give and confer upon such receiver the power to make needful assessments upon said lands in proportion to benefits and the relative value of each tract thereof, and with the money arising therefrom, or by the mortgage of such assessments and the lands upon which they are made, raise the money necessary for the repair and improvement of the said levee and other works, and with the money so raised proceed to repair and improve said levee until it is made adequate for the drainage and protection of all of the said lands; that each and every of said defendants herein may be enjoined by this honorable court from selling, transferring, or assigning the title to said lands owned by them, or any part thereof, upon which any of said assessments may rest, except subject to the lien of said assessments, as the same shall be determined by this honorable court, or in any manner whatsoever changing, altering, or affecting the title thereto so as to in any wise impair, diminish, hinder, or prejudice the lien of said assessments thereon, or on any portion thereof, and that the Sny Island levee drainage district, its offi-

cers and agents, be enjoined from selling or offering for sale any lands covered by any of the assessments herein in question, for any pretended assessments or alleged liens by said district attempted to be assessed, except subject to the lien of all assessments and liability on said lands, respectively, as the same shall be determined by this honorable court."

It was further asked in the bill that the court order, determine, and declare the amounts due to the plaintiffs and all other holders of bonds and coupons who would come in and contribute to the expenses of this suit, "and the amount due for principal and interest on the several assessments made against and upon each tract of land described in the pleadings and exhibits, and the proportion of the amount of such assessments upon each tract of land necessary to the payment of the amount of the principal and interest now due upon the bonds and coupons of your orators and others who may come into the cause and contribute as before mentioned, and that each of the said tracts of land be sold under the order and decree of this court for the amount chargeable upon and against the same, unless the owner of the same, or some other person for him, shall, within a day limited, pay said amount, with a just proportion of the costs of this suit," and also that the court would "appoint one or more commissioners or receivers in the place and stead of the said John G. Wheelock and George W. Jones, or appoint a commissioner in the place of the said Benjamin F. Westlake, deceased; and, if one or more commissioners or a receiver or receivers are appointed in the place and stead of the said John G. Wheelock and George W. Jones, the said Wheelock and Jones may be ordered and directed to turn over and deliver to such commissioners or receivers so appointed all books, papers, documents, and property now in their possession or under their control."

The defendants demurred to the bill, and the demurrers were overruled. They subsequently filed answers, which put the plaintiffs upon proof of many essential allegations of their bill, without proof of which, independently of the question of law arising upon the face of the bill, no part of the relief asked could have been granted. In the view which is taken of the case by this court, it is unnecessary to extend this opinion by setting forth the averments and denials of the several answers.

Upon final hearing the circuit court dismissed the bill.

Naturally, the first question to be considered is whether the act of 1871, under which the bonds in question were issued, is to be treated as consistent with the constitution of Illinois in force when that act was passed. We have seen what the highest court of the state said upon that subject in Updike v. Wright and Webster v. People, above cited. The language used by that court is so clear and emphatic as to leave no room to doubt that it intended to adjudge that the act of 1871 was unconstitutional, and that any proceedings taken under it, whether by commissioners, juries, or courts, were without the sanction of law. When the court adjudged that, as a corollary from the propositions stated by it, "neither the commissioners or the juries selected, nor the county court, is such

a body as, under the constitution, may be given power to make local improvements by special assessments or by special taxation upon contiguous property," the question of the constitutionality of the act of 1871 was concluded so far the supreme court of Illinois was concerned. The only doubt that can arise as to the scope of the decisions in Updike v. Wright and Webster v. People comes from some general observations of the court in Blake v. People, 109 Ill. 504, 520. But that case arose under the act of May 29, 1879, which was based upon the amendment of the state constitution adopted in 1878. That amendment, as is said in Blake v. People, was adopted in order to obviate the effect of the decisions in the Updike and Webster Cases. Referring to the corporation whose authority was involved in the Blake Case, the court said it was not created to construct drains, ditches and levees, "but simply for the purpose of maintaining and keeping in repair what is known as the 'Sny Island Levee,'—a levee claimed to have been made by a corporation purporting to be created under and by virtue of 'An act to provide for the construction and protection of drains, ditches and levees,' approved April 24, 1871,"—as to which corporation this court held in Webster v. People (unreported), following Updike v. Wright, 81 Ill. 49, that the construction of a levee along the river, as an independent work, was not authorized by the constitution then in force, or said act of April 24, 1871, and that so much of that act as purported to vest drainage commissioners with power to levy and collect taxes for the construction of drains, levees, etc., was repugnant to the constitution and inoperative." The question before the court was as to the powers of the corporation organized under the act of 1879, which was passed in execution of the constitutional amendment of 1878, adopted after the act of 1871 was declared to be repugnant to the constitution of 1870. What was said in the Blake Case as to the act of 1871 cannot be taken as modifying the decision in the former cases, which was to the effect that the state constitution stood in the way of all that was done under that act by the commissioners, the juries, or the county court.

But it is suggested that, as the bonds in question were issued before the Updike and Webster Cases were decided, it was both the province and duty of the federal court to determine for itself the constitutionality of the act of 1871, and if, in its judgment, that act was valid under the constitution of Illinois, its decree should protect the rights of parties, whatever may have been the views expressed by the highest court of Illinois upon that question. In support of this view, counsel cite numerous cases, among which is Burgess v. Seligman, 107 U. S. 20, 33–35, 2 Sup. Ct. 21. In that case it appeared that, after the determination of a case in the circuit court of the United States, the highest court of the state decided two cases adversely to the judgment in the federal court. Each case involved the same transactions, and required a construction of a local statute. The supreme court of the United States, upon full consideration, said:

"We do not consider ourselves bound to follow the decision of the state court in this case. When the transaction in controversy occurred, and when the

case was under the consideration of the circuit court, no construction of the statute had been given by the state tribunals contrary to that given by the circuit court. The federal courts have an independent jurisdiction in the administration of state laws, co-ordinate with, and not subordinate to, that of the state courts, and are bound to exercise their own judgment as to the meaning and effect of those laws. The existence of two co-ordinate jurisdictions in the same territory is peculiar, and the results would be anomalous and inconvenient, but for the exercise of mutual respect and deference. Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that by the course of their decisions certain rules are established, which become rules of property and action in the state, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate, and the construction of state constitutions and statutes. Such established rules are always regarded by the federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But, where the law has not been thus settled, it is the right and duty of the federal courts to exercise their own judgment, as they also always do in reference to the doctrines of commercial law and general jurisprudence. So, when contracts and transactions have been entered into, and rights have accrued thereon, under a particular state of the decisions, or when there has been no decision of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued. But, even in such cases, for the sake of harmony and to avoid confusion, the federal courts will lean towards an agreement of views with the state courts, if the question seems to them balanced with doubt. Acting on these principles, founded as they are on comity and good sense, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflict with the well-considered decisions of the state courts. As, however, the very object of giving to the national courts jurisdiction to administer the laws of the states in controversies between citizens of different states was to institute independent tribunals, which it might be supposed would be unaffected by local prejudices and sectional views, it would be a dereliction of their duty not to exercise an independent judgment in cases not foreclosed by previous adjudication. As this matter has received our special consideration, we have endeavored thus briefly to state our views with distinctness, in order to obviate any misapprehensions that may arise from language used and expressions used in previous decisions. The principal cases bearing upon the subject are referred to in the note, but it is not deemed necessary to discuss them in detail. In the present case, as already observed, when the transactions in question took place, and when the decision of the circuit court was rendered, not only was there no settled construction of the statute on the point under consideration, but the Missouri cases referred to arose upon the identical transactions which the circuit court was called upon, and which we are now called upon, to consider. It can hardly be contended that the federal court was to wait for the state courts to decide the merits of the controversy, and then simply register their decision, or that the judgment of the circuit court should be reversed merely because the state court has since adopted a different view. If we could see fair and reasonable ground to acquiesce in that view, we should gladly do so; but, in the exercise of that independent judgment which it is our duty to apply to the case, we are forced to a different conclusion. Pease v. Peck, 18 How. 595, and Morgan v. Curtenius, 20 How. 1, in which the opinions of the court were delivered by Mr. Justice Grier, are precisely in point."

We are not aware of any decision of the supreme court which materially qualifies the declaration in that case, and we deem it our duty to give it full force in deciding the question now under consideration. In other words, as the act of 1871 had not been construed by the supreme court of Illinois when the bonds held by the plaintiffs were issued, it is the province and duty of this court to exercise an independent judgment as to its validity under the constitu-

tion of Illinois. But in doing this there are two principles that should not be overlooked: (1) That, although the act of 1871 may not have been expressly the subject of judicial construction before the rights of the plaintiffs accrued, this court should give effect to any rules of construction that may have been previously established by the highest court of the state when interpreting similar provisions in the constitution of 1848; (2) that the federal courts, for the sake of harmony and to avoid confusion, should "lean towards an agreement of views with the state courts, if the question seems to them balanced with doubt," and endeavor to avoid "any unseemly conflict with the well-considered decisions of the state courts" upon questions of local law. These considerations have peculiar, if not controlling, weight when the question to be determined relates to the jurisdiction or power, under the fundamental law of a state, of tribunals or bodies created by legislative enactment, and charged with the performance of public duties. As the supreme court of Illinois held that the act of 1871 was repugnant to the state constitution of 1870, so far as it authorized improvements by special assessments through the agency of county courts, commissioners, and juries, the federal court, when exercising its independent judgment, should not act upon a different view of the state constitution, unless compelled to do so by reasons so obviously sound that to refuse to follow them to their logical conclusion would be an absolute denial of justice.

Looking, then, at the question just as we would do if it had been presented when the bonds were issued, we think that the interpretation placed by the supreme court of Illinois upon the state constitution was justified, if not required, by its decisions relating to a similar provision in the constitution of 1848.

We have seen that by the fifth section of article 9 of the state constitution of 1848 it was provided that "the corporate authorities of counties, townships, school districts, cities, towns and villages may be vested with power to assess and collect taxes for corporate purposes; such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same,"—while the corresponding provision in the constitution of 1870 was that "the general assembly may vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessments, or by special taxation of contiguous property, or otherwise. For all other corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes, but such taxes shall be uniform in respect to persons and property within the jurisdiction of the body imposing the same."

Now, it was frequently held by the supreme court of Illinois, prior to the passage of the act of 1871, that the above provision of the state constitution of 1848 was restrictive in its nature, and that the legislature could not constitutionally confer the power to tax upon any other than the corporate authorities of counties, townships, school districts, cities, towns, and villages. Harward v. Drainage Co. (1869) 51 Ill. 130; Harter v. Kernochan (1880) 103 U. S. 562, 570. When, therefore, the state court came to consider the scope and effect of

section 9, art. 9, of the constitution of 1870, the rule announced in cases arising under the previous constitution led, as we think, to the conclusion announced in Updike v. Wright, and applied in Webster v. People, as to the act of 1871, namely, that the legislature could invest only "cities, towns and villages" with power to make local, improvements by special assessments or impose special taxation upon contiguous property benefited by such improvement, and that by necessary implication it could not confer that power upon other municipal corporations or upon private corporations. So that when the act of 1871 was passed every one had notice that by the settled course of judicial decision in Illinois the powers conferred by that act upon the county courts, commissioners, and juries could not be exercised consistently with the constitution of the state as it then was. As under the constitution of 1848 the grant of power to the legislature to vest the corporate authorities of "counties, townships, school districts, cities, towns and villages," with authority to assess and collect taxes for corporate purposes—such taxes to be uniform in respect of persons and property within the jurisdiction of the body imposing the same—was an inhibition upon the legislature granting power to assess and collect taxes to any other than the corporations or the municipalities or districts to be taxed, so the provision of the constitution of 1870 declaring that the legislature could vest the corporate authorities of "cities, towns and villages" with power to make local improvements by special assessments or by special taxation of contiguous property or otherwise was an inhibition upon any legislation conferring that power upon other municipal corporations or upon private corporations. We therefore hold that the act of 1871, under which the bonds in question were issued, was repugnant to the constitution of Illinois of 1870. Consequently the bonds were executed without legal authority, and no valid lien was created or exists, by virtue of that statute, upon any of the lands embraced within the territory described in the proceedings instituted in the county court.

But it is contended that, even if the act of 1871 be held to be unconstitutional, the plaintiffs are entitled to relief as against all the defendants who have received a valuable consideration through the statute procured by their own consent, or subsequently sanctioned by them, and by which they derived an interest. Some authorities are cited which apparently support this view. But, when carefully examined, they do not, we think, apply to a case in which the circumstances are so peculiar as those disclosed by the present record. All who had any connection with the passage of the act of 1871, or who desired its passage, acted, as we may assume, in good faith, and in the firm belief that its provisions were not inconsistent with the constitution of the state. It cannot be said that any one was guilty of fraud. No assurances of an affirmative character were given by the landowners to those who constructed the work, or to those who, like Palms, purchased the bonds after they were executed and delivered to the contractors. The landowners, the contractors, and the purchasers of bonds all had equal opportunities of information, and one class was no more to be charged with knowledge of the law than

another class. It is a case of an honest mistake as to the competency of the legislature to do what it attempted to do, no one being misled by the assurances and representations of others. The entire argument of learned counsel for the plaintiffs on this part of the case leaves out of view, or assumes to be of no consequence whatever, the fact, apparent on the face of the act of 1871, that what the landowners, proceeding under it, had in view, was not simply to have a levee constructed, but to have a sufficient levee, which could be repaired from time to time and permanently maintained under legal authority. In the very nature of things, it cannot be supposed that any landowner would have become connected with the scheme embodied in the act of 1871 unless the maintenance of the levee by competent legal authority was assured. It is therefore unjust to the landowners to say nothing more than that they assented to the construction of the levee. If they are to be deemed to have assented to anything, it must be further said that they assented to a scheme under which a levee was to be constructed and maintained, under the authority of law, from time to time, and so as to accomplish the results contemplated by the legislature. The system devised by the act of 1871 is to be looked at in its entirety. We cannot put out of view a vital part of it, and hold the landowners who acted in good faith, and who gave no personal assurances or made any representations, responsible for the results to others flowing from invalid legislation and the partial execution of the original plans. If it be said that the plaintiffs' testator would never have purchased the bonds except in the belief that the act of 1871 was valid, with equal truth it may be said that the landowners never would have sought or desired such legislation except in the belief that the levee would be maintained by the same authority that constructed it.

In our consideration of this question we have assumed, in accordance with the allegation of the plaintiffs, that the defendants, or some of them, "procured" the passage of the act of 1871. But we are of opinion that it is not appropriate to say that the enactment was procured by any individual or individuals. It must be conclusively assumed that the legislature, although hearing what individuals said on the subject, acted upon its own judgment as to what was proper to be done. It may be that under certain circumstances individuals may incur responsibility by reason of acts or representations on their part under an enactment adjudged to be invalid. But representations made by them to the legislature in reference to a proposed enactment, or any expression of their desire for the passage of such enactment, cannot be regarded as material in determining questions of responsibility or liability for acts done under or in execution of legislation supposed at the time to be valid, but subsequently adjudged to be invalid.

It is said that the defendants are in the actual enjoyment of the work done under the act of 1871, and therefore they are equitably bound to pay for it. In what sense are they in the enjoyment of such work? There was evidence tending to show—indeed, we think the weight of the evidence was—that the levee built under the act of 1871 was not adequately constructed. At any rate, it broke in 1876,

and left the lands intended to be benefited in a condition almost as bad as when the act of 1871 was passed. Fences, improvements, and houses were washed away, entailing large losses upon landowners. That was the condition of the levee at the time, or shortly after, the state court, in Webster v. People, following Updike v. Wright, declared that act to be unconstitutional. Such repairs as could be made with private means were made by the landowners, or under their direction. But the levee again broke in 1880, and a third time in 1881. The amendment to the constitution having been adopted, and the act of 1879 passed, the Sny levee drainage district was organized, and that organization and private individuals together had expended prior to 1894, in repairing the levee and in rebuilding parts of it, nearly $500,000. The proof makes it quite clear that the levee work done under the act of 1871 would have been substantially without value for the protection of the landowners, but for what they did out of their own means after the break in 1876, and what was done under the new organization which came into existence under the constitutional amendment of 1878 and the act of 1879. It is true that what remained of the levee constructed under the act of 1871 is in the possession of the Sny Island levee drainage district. They received possession in 1880 from the commissioners appointed under that act. But we perceive nothing in all that was done to justify the contention that the landowners are to be deemed so far in the possession of the work done under the act of 1871 as to place their lands in lien in order to secure the payment of the bonds in suit. Their lands could not be specially assessed under the void act of 1871, nor did the bondholders have the right, by reason of anything done or proceedings taken under that act, to charge such lands with liability for the amount of the bonds. Here was a broken levee, and, after the decisions in Updike v. Wright and Webster v. People, an entire absence of valid legislation under which the landowners could unitedly act for their protection. Nothing was left for them except to proceed under the act of 1879. Some of them did so, and caused the organization of a new body which could proceed legally for their protection. That body could not have removed the work done under the act of 1871, and the commissioners appointed under that act were without power or means to proceed. There was nothing to be done, except for the new body to put the old levee in safe condition. But that act of the new organization could not have the effect to subject the lands inside of the old levee to assessment or to a lien for the payment of the debt that was created by the old organization without authority of law. If the landowners get some benefit from that part of the old levee which stood when the new body was organized, it was because it was there and could not be removed. As the special assessments under the act of 1871 were without authority of law, no equitable right could arise against the landowners and in favor of the bondholders to have the lands of such owners sold to pay the amount of the bonds. The money paid by the plaintiffs' testator for the bonds did not go into the hands of the individual landowners, nor were they applied in the direct improvement of the lands specially assessed. It went to the contractors, and,

while we may assume that it was used by the contractors in building the old levee, that fact cannot justify a decree ordering the lands so assessed under a void statute to be sold for the benefit of bond-holders. The argument in support of such a decree overlooks the fact that, if the landowners are to be deemed to have procured or assented to the proceedings under the act of 1871, they did so upon the condition that a levee was to be built and maintained under the authority of that act. That condition failed, because, contrary to the expectation of all interested in them, those proceedings were adjudged to be without the sanction of law.

A case quite in point is that of Litchfield v. Ballou, 114 U. S. 190, 194, 5 Sup. Ct. 822. Ballou held bonds issued and sold to him by the city of Litchfield, Ill. The money received from him for the bonds was used by the city to aid in the construction of a system of water-works of which it was the owner. In a suit between the city and another holder of bonds of the same issue, the bonds were held void because issued in violation of section 12, art. 9, of the state constitution. Ballou then sued in equity, alleging that although the bonds were void the city was liable for the money it received of him; and, as by the use of that money the waterworks were constructed, he prayed for a decree for the amount, and, if it was not paid within a reasonable time, that the waterworks of the city be sold to satisfy such decree. Among other allegations in the bill was one to the effect that he was misled into purchasing the bonds by the false statements of the officers, agents, and attorneys of the city that the bonds were valid. It appeared in proof that much the larger part of the money for which the bonds were sold was used to pay the contractors who built the works. The supreme court held that the action could not be maintained; saying, among other things:

"But here, also, the decree departs from what is now asserted to be the principle of the bill. Having decreed an indebtedness where none can exist, and declared that complainant has a lien on, not the ownership of, the water-works, it directs a sale of the waterworks for the payment of this debt and the satisfaction of this lien. If this be a mode of pursuing and reclaiming specific property into which money has been transmuted, it is a new mode. If the theory of appellee's counsel be true, there is no lien on the property. There is no debt to be secured by a lien. That theory discards the idea of a debt, and pursues the money into the property, and seeks the property, not as the property of the city to be sold to pay a debt, but as the property of complainant, into which his money, not the city's, has been invested, for the reason that there was no debt created by the transaction. The money received on the bonds having been expended, with other funds raised by taxation, in erecting the waterworks of the city, to impose the amount thereof as a lien upon these public works would be equally a violation of the constitutional prohibition, as to raise against the city an implied assumpsit for money had and received. The holders of the bonds and agents of the city are particeps criminis in the act of violating that prohibition, and equity will no more raise a resulting trust in favor of the bondholders than the law will raise an implied assumpsit against a public policy so strongly declared."

Another case that is instructive on the point under consideration is Ætna Life Insurance Co. v. Town of Middleport, 124 U. S. 534, 546–548, 8 Sup. Ct. 628. That was a suit in equity by an insurance company, as purchaser and holder of bonds payable to bearer, issued by a township in Illinois in conformity with a popular vote authoriz-

ing a tax to aid in the construction of a railroad. The bonds were held to be void, because issued without authority of law. The theory upon which the suit was brought was that by the issuing or delivery of the bonds to the railroad company, and by their sale to the plaintiff, the latter was thereby subrogated to the rights of action which the railroad company would have on the contract evidenced by the vote of the town, and the acceptance and fulfillment of the contract by the railroad company. The supreme court held that there could be no subrogation. That court said:

"In the present case there was no borrowing of money. There was nothing which pretended to take that form. No money of the complainants ever went into the treasury of the town of Middleport. That municipality never received any money in that transaction. It did not sell the bonds, either to complainant or anybody else. It simply delivered bonds, which it had no authority to issue, to the railroad company, and that corporation accepted them in satisfaction of the donation by way of taxation which had been voted in aid of the construction of its road. The whole transaction of the execution and delivery of these bonds was utterly void, because there was no authority in the town to borrow money or to execute bonds for the payment of the sum voted to the railroad company. They conferred no right upon anybody, and, of course, the transaction by which they were passed by that company to complainant could create no obligation, legal or implied, on the part of the town to pay that sum to any holder of these bonds. * * * One of the principles lying at the foundation of subrogation in equity, in addition to the one already stated,—that the person seeking this subrogation must have paid the debt,—is that he must have done this under some necessity, to save himself from loss which might arise or accrue to him by the enforcement of the debt in the hands of the original creditor; that, being forced under such circumstances to pay off the debt of a creditor who had some superior lien or right to his own, he could for that reason be subrogated to such rights as the creditor whose debt he had paid had against the original debtor. As we have already said, the plaintiff in this case paid no debt. It bought certain bonds of the railroad company at such discount as was agreed upon between the parties, and took them for the money agreed to be paid therefor. * * * The fact that the bonds were void, whatever right it may have given against the railroad company, gave it no right to proceed upon another contract and another obligation of the town to the railroad company."

We are of opinion that the plaintiffs are not entitled, upon principles of equity, to reach the lands of the individual defendants in order to secure the payment of the bonds in question. The bonds were issued without authority of law, and there was nothing in the acts or conduct of the defendants that estops them from alleging the invalidity of the act of 1871, or which creates an equity in the bondholders to enforce or have the benefit of any special assessments made under that act. The plaintiffs can take nothing, as against the individual landowners, defendants in this cause, by reason of any order made in the suit instigated by Palms in the circuit court of the United States against the commissioners designated under the act of 1871; for the present defendant landowners were not parties to that suit, and could not be concluded by any order made in it. It is evident from the orders entered in that case that Judge Drummond did not intend to pass upon the rights of the landowners, but was of opinion that if Palms had any ground of action against them, in respect of the lands attempted to be specially assessed under the act of 1871, he must bring them before the court by supplemental bill. He was given leave to file such a bill by an order en-

tered in 1879. But he died in 1886 without availing himself of the privilege so given, although a large amount of interest was unpaid, and although nearly $100,000 of the bonds of the first issue had fallen due. The present bill was not filed until 1889,—about nine years after it could have been filed. If the case depended alone upon the question of laches, there would be strong ground for holding that the plaintiffs and their testator so long delayed the institution of proceedings against the landowners that a court of equity ought to decline giving them any relief. The application of such a principle would be peculiarly appropriate, because it is provided by statute in Illinois that no execution can issue upon a judgment after the expiration of seven years from the time it becomes a lien, except upon the revival of the same by scire facias, and that an action to recover real estate shall be barred by seven years' residence thereon under a title of record, etc., by seven years' adverse possession under color of title and payment of taxes, or, as to unoccupied land, by seven years' payment of taxes under color of title. 2 Starr & C. Ann. St. (Ill.) p. 1386, c. 77, § 6; Id. pp. 1538, 1539, 1547, c. 83, §§ 4, 6, 7. In this case most of the defendants made proof of adverse possession. Besides, as said in Johnston v. Mining Co., 148 U. S. 360, 370, 13 Sup. Ct. 585, "the mere institution of a suit does not of itself relieve a person from the charge of laches," and, "if he fail in the diligent prosecution of the action, the consequences are the same as though no action had been begun."

But without discussing the adjudged cases upon the subject of laches, and passing many questions discussed by counsel, and which we deem it unnecessary to decide, we affirm the decree of the circuit court upon these grounds: (1) The act of 1871 was repugnant to the constitution of Illinois of 1870; (2) the bonds issued under that act were void; (3) the lands intended to be benefited and protected by the levee constructed under the act of 1871 could not be specially assessed by any action taken in conformity with the provisions of that act; (4) nothing was done or said by the owners of the lands so intended to be benefited and protected that estopped them to dispute the validity of the act of 1871, and of all that was done under it, or that created any equity in favor of the holders of bonds to have said lands sold to pay any special assessment or the bonds issued to contractors.

Decree affirmed.

Judge SHOWALTER participated in the hearing, but not in the decision, of this case.