LISMAN et al. v. KNICKERBOCKER TRUST CO. et al.

SAME v. UNITED STATES MORTGAGE & TRUST CO. et al. (two cases).

(Circuit Court of Appeals, Sixth Circuit. January 13, 1914.)

Nos. 2120, 2121, 2145.

1. APPEAL AND ERROR (§ 843*)—REVIEW—MOOT QUESTIONS. .
When without fault of the appellee a situation has arisen by which the issues raised by an appeal have become moot, so making a decision by the appellate court thereon nugatory, that court need not, and ordinarily will not, make such decision, and the rule is not altered by the fact that questions of costs are involved. Upon the point whether questions presented are in fact moot, the court may satisfy itself, if necessary, by extrinsic evidence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3331–3341; Dec. Dig. § 843.*]

2. COURTS (§ 366*)—FEDERAL COURTS—AUTHORITY OF STATE DECISIONS—CONSTRUCTION OF STATE STATUTES.
In construing a state statute a federal court is bound by a decision of the highest court of the state construing a prior statute on the same subject, which would logically and necessarily require a similar construction of the one under consideration.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 954–957, 960–968; Dec. Dig. § 366.*

Conclusiveness of judgment between federal and state courts, see notes to Kansas City, Ft. S. & M. R. Co. v. Morgan, 21 C. C. A. 478; Union & Planters' Bank v. City of Memphis, 49 C. C. A. 468; Converse v. Stewart, 118 C. C. A. 215.]

3. RAILROADS (§ 118*)—PURCHASE OF CONTROLLING INTEREST IN OTHER COMPANIES—MICHIGAN STATUTE.
Under Pub. Acts Mich. 1901, No. 30, which authorizes any railroad company to acquire by lease or purchase, by purchase of stock or otherwise as the parties may agree, the road of another company, said railroads not having the same terminal points and not being competing lines, one railroad company of the state may lawfully purchase a majority of the stock of another for the purpose of acquiring the control and management of its road, where it is not in competition with its own line.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 375; Dec. Dig. § 118.*]

4. RAILROADS (§ 168*)—MORTGAGE—VALIDITY OF BOND ISSUE.
A mortgage by a railroad company to secure bonds provided for an additional issue thereunder to a maximum amount to be used in the purchase or construction of extensions, branches, or spurs, etc., and such other purposes as the board of directors might deem calculated to increase the business and earning capacity of the property. Held, that such provision authorized the issuance of such bonds by the directors to be used in payment for a controlling interest in the stock of another company for the purpose of acquiring control of the line of such company and operating it in connection with its own.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 534, 535; Dec. Dig. § 168.*]

5. RAILROADS (§ 186*)—SUIT TO FORECLOSE MORTGAGE—INTERVENTION—DISCRETION OF COURT.
In a suit to foreclose a railroad mortgage, it is within the discretion of the court to refuse permission to a bondholder to intervene for the purpose

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of raising collateral issues which would not otherwise be concluded by the foreclosure decree.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 615, 616; Dec. Dig. § 186.*]

Appeals from the Circuit Court of the United States for the Eastern District of Michigan; Henry M. Swan, Judge.

Suit by the Knickerbocker Trust Company against the Detroit, Toledo & Ironton Railroad Company. From two certain decrees and an order of confirmation entered on behalf of other interveners, Frederick J. Lisman and others appeal. Affirmed.

The Detroit, Toledo & Ironton Railroad Company, which is the successor of the Detroit Southern Railroad Company, was organized May 2, 1905, under the railroad laws of Michigan, the organization being effected through the investment brokerage firm of Hollins & Co. Its main line extended from Ironton, Ohio, which is on the southern line of that state, in a generally northerly direction through Dundee, Mich., to Detroit. It owned all of its main line except three small portions, over which it had trackage rights. On its organization it gave to the Knickerbocker Trust Company (hereafter called the Knickerbocker Company), as trustee, its so-called "consolidated mortgage," securing items for which bonds of unquestioned validity to the extent of $4,-357,000 were immediately certified and issued. This mortgage also provided for the issue of further bonds to the extent of $8,252,000, to be used for the purchase or construction of extensions, branches, or spurs, the improvement of certain terminals, the construction of a bridge or bridges across the Ohio river, and "the acquisition of additional terminals, rolling stock and equipment, the construction of betterments and improvements, and such other purposes as the board of directors of the railway company may deem calculated to increase the business and earning capacity of the property." Soon after this reorganization the railroad company purchased, through the brokerage firm of Rudolph Kleybolte & Co., for $5,000,000, a considerable majority of both the preferred and common stock of the Ann Arbor Railroad Company, a corporation likewise organized under the Michigan Railroad Laws, its road extending from Toledo, Ohio, in a generally northwesterly direction, through Dundee, Mich., to Frankfort in that state. To secure this purchase price, as well as the additional sum of $500,000 obtained through Kleybolte & Co., the Detroit, Toledo & Ironton issued its so-called collateral trust notes, semiannual interest coupon bearing, maturing December 1, 1908, in the amount of $5,500,000, securing these notes by pledge and deposit of the Ann Arbor stock, together with $5,000,000 of bonds issued under the consolidated mortgage; this pledge being evidenced by a so-called collateral trust agreement between the Detroit, Toledo & Ironton Railroad Company and the United States Mortgage & Trust Company (hereafter called the United States Company), as trustee, which agreement contemplated the purchase of further amounts of Ann Arbor stock and the issue of collateral trust notes therefor. By a supplementary arrangement, the lien of the consolidated mortgage was made to extend to such equity in the pledged stock and bonds as might remain after the satisfaction of the collateral trust notes. Since this purchase the Detroit, Toledo & Ironton Railroad Company, through directors elected by virtue of such stock ownership, has operated and controlled the Ann Arbor road.

The meritorious questions presented by this record concern the legality of this Ann Arbor purchase and the validity of the $5,000,000 of consolidated bonds issued therefor. Underlying this consolidated mortgage were two mortgages, one on the middle or Ohio Southern Division, under which about $4,-500,000 of bonds had been issued and were outstanding; the other, a new mortgage called "the general lien and divisional first mortgage," given by the Detroit, Toledo & Ironton Railroad Company to the New York Trust Company, as trustee, which constituted a second mortgage upon the Middle Divi-

sion and a first mortgage upon two other divisions. Under this latter mortgage $4,253,000 of bonds were issued and outstanding.

On February 1, 1908, the Knickerbocker Company filed its bill in the court below against the Detroit, Toledo & Ironton Railroad Company, for the foreclosure of the consolidated mortgage on account of nonpayment of semiannual interest, that day maturing upon the entire issue of $9,357,000; two receivers were immediately appointed, a third being later added upon the application of the so-called Ramsey Committee, which represented the holders of a considerable majority of the collateral trust notes. Later Courtney, a preferred stockholder in, and the Citizens' National Bank, of Springfield, Ohio, a creditor of, the Detroit, Toledo & Ironton Railroad Company, were allowed to intervene; their proceeding was consolidated with the foreclosure suit, and the receivership extended to railroad property alleged not to be embraced within the lien of the consolidated mortgage. In December following, the United States Company, under power of sale in the collateral trust agreement, gave notice of sale at public auction of the Ann Arbor stock and the $5,000,000 of consolidated mortgage bonds. The proposed sale having been temporarily enjoined in a proceeding instituted in the Supreme Court of New York by one Redmond, who assailed the validity of the Ann Arbor purchase and the $5,-000,000 bond issue, the railroad receivers then filed their petition in the Consolidated Mortgage foreclosure suit, calling attention to the contest over the validity of the $5,000,000 bond issue and the proposed auction sale in New York, and asking that the court below, which had jurisdiction of the res and of the persons interested, determine the questions involved. Under this proceeding the proposed sale of the pledged stock and bonds was restrained until further order. The United States Company immediately obtained permission to intervene in the consolidated mortgage foreclosure suit, and filed therein a petition, setting up the conflicting claims concerning the validity of the Ann Arbor purchase and the issue of the mortgage bonds thereon, and praying that the trustee's title under the collateral trust agreement be determined, for permission to sell the pledged stocks under the power of sale in that agreement, for injunction and for general relief. The Ramsey Committee intervened and asked relief similar to that prayed by the United States Company. This petition of the trustee was immediately followed by the filing, in the consolidated mortgage foreclosure suit, of its dependent bill, asking substantially the same relief as in the petition mentioned. Appellants comprise: First, the members of the investment brokerage firm of F. J. Lisman & Co., who are owners of a considerable number of consolidated mortgage bonds disconnected with the Ann Arbor purchase and certain Detroit, Toledo & Ironton preferred stock; and, second, the members of the so-called King Committee, which represents holders of such preferred stock. Upon the filing of the receivers' petition appellants asked leave to intervene and file a cross-bill, making defendants thereto the Knickerbocker Company, the United States Company, Hollins & Co., and the Ramsey Committee. A few months later it filed in the consolidated mortgage foreclosure suit a further intervening petition and dependent bill, making defendants thereto (in addition to those named in the proposed cross-bill) the Detroit, Toledo & Ironton Railroad Company, the three railroad receivers, and the Ann Arbor Railroad Company.

In all these proceedings by appellants the invalidity of the Ann Arbor purchase and the consolidated mortgage bonds issued therefor was asserted; and in the later pleadings it was, among other things, further alleged, in substance, that the Ann Arbor purchase was in pursuance of a fraudulent scheme between the promoters of the reorganization, whereby Ann Arbor stock, which cost the promoters but $3,500,000, was sold, practically to themselves as directors, for $5,000,000; that the default on the collateral trust notes was brought about by collusion between Hollins & Co., the United States Company and the controlling power of the two railroad companies, in the interest of a contemplated reorganization; it being alleged that a large amount of Ann Arbor funds available for the payment of dividends on its stock, and which if paid would have prevented default, had been wrongfully loaned to Hollins & Co.; also that the certification by the Knickerbocker Company of the $5,-000,000 consolidated mortgage bonds was unlawful. Appellants asked that

the collateral trust bond issue be declared invalid and not secured by the consolidated mortgage; that Hollins & Co. be required to pay into court the value of certain stocks and bonds of the Detroit, Toledo & Ironton Railroad Company, claimed to have been issued to that firm in connection with the re-organization, and for other relief unnecessary to be stated. No formal leave was given appellants to file either the cross-bill or the dependent bill, or to intervene in any of the proceedings connected with the foreclosure suits. Although not made defendants to the dependent bill of the United States Company, or to the intervening petition of that company or of the Ramsey Committee, appellants filed answers to both petitions and entered appearance in the other proceeding, motion being made to strike the appearance and answers from the files. The Ramsey Committee and Knickerbocker Company filed formal objections to appellants' first petition to intervene and for leave to file ·cross-bill. Upon the filing of appellants' dependent bill subpœna was issued and order made for the appearance of nonresident defendants; a similar order of appearance being made under the amendment to the former petition for intervention and cross-bill. Motions to set aside the order of appearance and to quash service were made by the United States Company and by the Ramsey Committee, with respect at least to the dependent bill. The Knickerbocker Company demurred to that bill. Neither this demurrer nor either of the motions to which we have lately referred were, however, formally or spe-·cifically disposed of. Hollins & Co. seem never to have appeared generally, or even to have entered' formal appearance, although they were recognized ·and heard by the court respecting certain of the proceedings.

In the order of reference to the master to take proofs upon the issues presented in the petition and dependent bill of the United States Company, in which the sale of the pledged collateral was asked, these issues, including the validity of the Ann Arbor purchase and the bonds issued thereon, appellants were "givèn an opportunity, if they so elect, to appear before said master to submit evidence and proofs and be heard upon the question of the validity of said securities and of the pledge thereof as special interveners for that purpose only; this order not to constitute them general interveners, or to entitle them to be heard or to offer proofs on other issues or proceedings in this ·cause or in said dependent cause," etc. Appellants unsuccessfully sought to have this order modified or set aside, because the complete issues presented by their proposed interventions and pleadings. were not referred, and because ·of a fear that the limited appearance, if availed of, would (unless otherwise ordered) prejudice them in their rights to be heard upon such further issues. They declined to accept the opportunity so given, and offered no proofs before the master in regard to any question; but were heard by the court, both orally and by printed brief, in opposition to the validity of the securities and their pledge. A decree was accordingly made on September 27, 1910, under the dependent bill of the United States Company, adjudging the validity of the Ann Arbor purchase, of the consolidated mortgage bonds issued thereon, of the collateral trust note agreement, and of the supplemental collateral trust agreement, and directing master's sale of the pledged securities; and four days later decree was entered in the proceeding instituted in the consolidated mortgage foreclosure suit by the petitions of the receivers and the United States Company, respectively, adjudging the regularity and validity of all the proceedings and securities mentioned, and declaring all holders of the $5,000,000 of bonds issued on the Ann Arbor purchase entitled to share ratably with all other consolidated mortgage bondholders in the proceeds of the sale of the mortgaged properties. This latter decree contained no order· · ·of sale. Sale was had under the terms of the first-mentioned decree, and the pledged securities sold to the chairman of the Ramsey Committee, the Ann Arbor stock being struck off at $2,000,000, and the $5,000,000 of consoli·dated bonds at $500,000.

From these two decrees and the order confirming the report of sale the appeals here are taken. When taken, no decree or order of sale had been made in the Consolidated Mortgage foreclosure suit. The meritorious ques-·tions raised by the appeal from the order of confirmation and argued here, .so far as they concern action since the decrees were rendered, relate to the re·

fusal to postpone the sale or its confirmation pending appeal from the order of sale, and, generally, to an alleged gross inadequacy of price brought by the sale. In connection with the hearing upon these three appeals, there was also heard the motion of the Knickerbocker Company, the United States Company, and the Ramsey Committee, to dismiss the appeals upon the ground that the questions raised thereby had become moot. It appears, by the undisputed showing in support of the motion, that since the decrees before us were rendered the entire Detroit, Toledo & Ironton Railroad property, with an exception hereafter stated, had been sold under foreclosures of the underlying mortgages, at prices barely sufficient to take care of the obligations and certificates of the receivers chargeable against the respective divisions, and the costs of foreclosure to date of sale, leaving nothing for distribution among the holders of the underlying bonds, and of course nothing for the consolidated mortgage bondholders. The exception stated is of 100 shares of stock of the Toledo Southern Railway Company and 1,014 shares of the preferred stock of the Ann Arbor Railroad Company, the combined value of both which stocks appears to be little, if anything, more than $50,000, which amount is shown to be insufficient to pay the trustee's fees and expenses and the costs of foreclosure of the consolidated mortgage, to say nothing of receivers' certificates, issued by order of court to the amount of $245,000.

Paskus, Cohen & Gordon, of New York City, and Doyle & Lewis, of Toledo, Ohio (John H. Doyle, of Toledo, Ohio, of counsel), for appellants.

Davies, Stone & Auerbach, of New York City (Charles E. Hotchkiss, of New York City, Leo M. Butzel, of Detroit, Mich., and Harold C. McCollom, of New York City, of counsel), for appellees Knickerbocker Trust Co. and others

Alexander L. Smith, of Toledo, Ohio, and F. Kingsbury Curtis and Irving M. Dittenhoefer, both of New York City, for appellees United States Mortgage & Trust Co. and another.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge (after stating the facts as above). [1] The rule is well settled that an appellate court need not, and ordinarily will not, decide a question purely moot; that is to say, when, without the fault of the appellees, a situation has arisen by which the issues raised by the appeal have become dead, so making a decision by the appellate court thereon nugatory Upon the point whether the questions presented are in fact moot, the court may satisfy itself, if necessary, by extrinsic evidence. Mills v. Green, 159 U. S. 651, 16 Sup. Ct. 132, 40 L. Ed. 293; Jones v. Montague, 194 U. S. 147, 24 Sup. Ct. 611, 48 L. Ed. 913; Richardson v. McChesney, 218 U. S. 487, 31 Sup. Ct. 43, 54 L. Ed. 1121; Buck Stove, etc., Co. v. American Federation of Labor, 219 U. S. 581, 31 Sup. Ct. 472, 55 L. Ed. 345; Gompers v. Buck Stove, etc., Co., 221 U. S. 418, 451, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Meyers v. Cheesman (C. C. A. 6) 174 Fed. 783, 785, 98 C. C. A. 491. The fact that questions of costs are involved does not alter the rule as to the dismissal of moot questions. Wingert v. First National Bank, 223 U. S. 670, 672, 32 Sup. Ct. 391, 56 L. Ed. 605. The appeal from the order confirming the master's report of sale of the stock and bonds pledged under the collateral trust agreement properly brings up for review only matters occurring since the decree appealed from. Every proceeding prior to those decrees may be reviewed, if at

all, only under the appeals therefrom, which are still pending and are now before us. Sage v. Railroad Co., 96 U. S. 712, 714, 24 L. Ed. 641. It is apparent that by the foreclosures of the underlying mortgages, for which appellees are not shown to be in any wise responsible, the criticisms upon the action of the court since the decrees were rendered have become moot. This is so because it is clear that a resale could not bring a sufficient price to leave anything applicable to appellants' securities under the supplementary lien of the consolidated mortgage. The value of the pledged bonds has been wiped out. If the Ann Arbor Railroad purchase was invalid, appellants are not concerned with the price brought on the trustee's sale of the Ann Arbor stock. If the Ann Arbor Railroad purchase is valid, appellants are not hurt by the low price brought or by the time of sale; for, although it may well be that the conditions imposed by the order of sale respecting the qualifications of bidders and the advantage given to some of the appellees, as well as the pending contest over the validity of the Ann Arbor purchase, would naturally tend to prevent substantial competition, and thus depress the sale price, yet there is no substantial evidence even tending to show that under the most favorable conditions possible the Ann Arbor stocks could be made to bring, either when sold or now, more than the $5,000,000 plus interest for which they were originally pledged, and so the appeal from the order of confirmation (No. 2145) should be dismissed.

The same considerations would naturally lead to a dismissal of the appeals from the two decrees, unless appellants' suggestion is well made that such dismissal, resulting in an adjudication of the meritorious questions of the validity of the Ann Arbor Railroad purchase and of the mortgage bonds issued therefor, might prejudice appellants in case of action against the Knickerbocker Company for unlawfully certifying bonds issued on account of the Ann Arbor purchase, or against certain others of the appellees on account of alleged misconduct connected with such railroad purchase or the defaults under the consolidated mortgage and the collateral trust agreement. We are not prepared to say that such dismissal might not have the effect stated; and so, without deciding that question, and without indicating an opinion whether or not the record tends to disclose basis for such suggested actions, we proceed to consider the meritorious questions last stated.

[3] In approaching this question we must assume that the purchase of the stock of the Ann Arbor Railroad was intended as a means of obtaining the control, operation, and practical ownership of that road, so far as such railroad ownership can result from ownership of a substantial majority of its stock, and the consequent ability to direct the railroad's affairs. Such is affirmatively shown to have been the intent of both parties to the purchase and sale, and such was the immediate and continued effect of the purchase. We, therefore, need not consider questions relating to mere stock purchase, not made and intended as a means of railroad purchase, control, and operation. In the absence of charter or other statutory provision therefor, the purchase in question would not be valid. Penn. Co. v. St. Louis, Alton Elec. R. Co., 118 U. S. 290, 309, 6 Sup. Ct. 1094, 30 L. Ed. 83. The

authority for the purchase relied upon by appellees is Act No. 30 of the Public Acts of Michigan of 1901 (page 50), which we cite in the margin.[1] The Supreme Court of Michigan has not construed this particular statute. That court has, however, in the case of Dewey v. Toledo, A. A. & N. M. Ry. Co., 91 Mich. 351, 51 N. W. 1063, construed the earlier statute of 1873 (How. Stat. § 3403, 2 Comp. Laws Mich. 1897, § 6328), relating to the same general subject-matter. The earlier statute, the first section of which we also cite in the margin,[2] provided

[1] "(No. 30.) An act to authorize any railroad company now organized or that may hereafter be organized under the laws of this state, to sell, lease and, convey its property and franchises to any other railroad company, whether organized within or without this state; and to acquire by lease or purchase from the owner of any other railroad such road or any part or portion thereof, whether located within or without this state, together with the rights and franchises connected therewith; and to provide for securing payment therefor; and to repeal act number one hundred two of the session laws of eighteen hundred ninety-three.

"The People of the State of Michigan enact: Section 1. It shall be lawful for any railroad company organized, or that may be organized, under the laws of this state, to sell, lease and convey its road, together with the rights and franchises connected therewith, or any part or portion thereof, to any other railroad company, whether organized within or without this state; and to acquire by lease or purchase from the owner of any other railroad such road, together with the rights and franchises connected therewith, or any part or portion thereof, whether located within or without this state; and for the railroad company so purchasing or leasing to acquire and use such road rights and franchises by purchase of the stock, or otherwise, as may be agreed between the parties interested, said railroads not having the same terminal points, and not being competing lines: Provided, that the stockholders owning a majority of the stock of said companies shall consent thereto: And provided further, that the company so purchasing or leasing shall hold and operate such road and said property and franchises subject to all the duties and obligations and with all the rights and privileges prescribed by the general railroad laws of this state.

"Sec. 2. The railroad company purchasing or leasing by virtue of this act may issue its bonds, secured by trust deed or mortgage, upon its property, rights and franchises, including the property and rights thus acquired, to make payment therefor; and such trust deed or mortgage shall have the effect of a purchase-money security: Provided, that nothing herein contained shall prejudice the rights of pre-existing creditors of the corporation from which such property and rights are purchased or leased.

"Sec. 3. Act number one hundred two of the session laws of eighteen hundred ninety-three and all acts and parts of acts in anywise contravening the provisions of this act are hereby repealed.

"This act is ordered to take immediate effect. Approved March 28, 1901."

[2] "(6328) Section 1. The People of the State of Michigan enact, that it shall be lawful for any railroad company in this state which shall have entered, in good faith, upon the work of constructing its road, and shall have become unable to complete the construction of the same or any part thereof, to sell, and convey the whole or any part of its road so partially completed, together with the rights and franchises connected therewith, to any other railroad company or corporation of this state not having the same terminal points and not being a competing line: Provided, that at any general or special meeting duly called for that purpose the stockholders carrying [owning] two-thirds of the stock of said company shall consent thereto: And provided further, that the company or corporation so purchasing shall hold such property and franchises, subject to all the obligations and duties, and with all the rights and privileges prescribed by the general railroad law of this state."

for the sale of the property and franchises of railroad companies, but limited the provision to uncompleted roads.

[2] The Dewey Case was a suit upon a note given for the purchase of the controlling stock of another railroad company. It was there expressly held that the sale of the stock of this other road to the Toledo, Ann Arbor & Grand Trunk Railway Company (the predecessor of the defendant in that case and of the present Ann Arbor Railroad) was authorized by the statute of 1873 (Laws 1873, No. 190). If the case before us involved the construction of the statute of 1873 we should be bound to accept the construction placed upon it by the Michigan Supreme Court, even though similar statutes of other states may have been differently construed by the highest courts of those states. Maiorano v. B. & O. R. R. Co., 213 U. S. 268, 29 Sup. Ct. 424, 53 L. Ed. 792; Audas v. Highland Land & Bldg. Co. (C. C. A. 6th Cir.). 205 Fed. 862, 863, and cases there cited. It is true that the statute of 1873 is not before us, but if it is clear that the construction placed upon that statute would logically and necessarily involve a similar construction of the statute of 1901, we should equally feel bound by the construction of the earlier statute adopted by the highest court of that state. Such is the rule respecting the construction of constitutional provisions (O'Brien v. Wheelock [C. C. A. 7th Cir.] 95 Fed. 883, 905, 37 C. C. A. 309, opinion by Mr. Justice Harlan; Gt. Southern Hotel Co. v. Jones, 193 U. S. 532, 547, 24 Sup. Ct. 576, 48 L. Ed. 778); and we think it equally applies to statutory construction. The statute of 1901 much more naturally suggests the legislative intent attributed in the Dewey Case to the 1873 statute than did that earlier statute. The statute of 1873 applied only to uncompleted roads, the later statute contains no such limitation, but extends to "any railroad company that may be organized"; the earlier statute made no provision for stock purchase, the later statute expressly provides for acquisition and use of the road, its rights and franchises "by purchase of the stock, or otherwise, as may be agreed upon by the parties interested"; the statute of 1873 required the consent of two-thirds of the stockholders of the selling road "at any general or special meeting duly called for that purpose"; the act of 1901 provides only that "the stockholders owning a majority of the stock of said companies shall consent thereto." We entertain no reasonable doubt that the Supreme Court of Michigan would construe the statute of 1901 fully as liberally as it construed the act of 1873. It is true that the action in the Dewey Case was against the maker of the purchase price note, and that the court gave, as an additional reason for its affirmance of the judgment below, that the contract had been completely executed, and so the defense of ultra vires was not available. But while it is true that a state decision, in order to be binding upon the federal courts, must be "based alone upon the statute construed" (Adelbert College v. Wabash R. R. Co. [C. C. A. 6th Cir.] 171 Fed. 805, 96 C. C. A. 465, 17 Ann. Cas. 1204, and cases there cited), we know of no rule which denies conclusive effect to an express and definite construction of a state statute, from the mere fact that an additional and wholly independent reason was given for sustaining the judgment under review. Moreover, the construc-

tion of the statute of 1873 was the utterance of the highest court of the state concerning the public policy of the state as declared by that statute; and we do not feel at liberty to disregard that construction. See Union Ry. Co. v. Illinois Central R. R. Co. (C. C. A. 6th Cir.) 207 Fed. 745, 750; also Zacher v. Fidelity Trust, etc., Co. (C. C. A. 6th Cir.) 106 Fed. 593, 599, 45 C. C. A. 480.

But were the rule respecting the decision of the state court otherwise than we have stated, the passage by the Legislature of the more explicit act of 1901, nine years after the decision of the Dewey Case, and presumably with knowledge of that decision, is compelling evidence of the legislative intent that the pertinent provisions of the later statute should be similarly construed; and it is common knowledge that more than one important railroad in Michigan has for many years been controlled through stock ownership by another railroad, and without apparent objection by the state authorities. We see no merit in the contentions that the statute authorizes such stock ownership only in aid of a prior acquisition of the physical property of the road, or that it imperatively requires either ownership of the entire stock or corporate action on the part of the selling company.

We may add that we think the title of the act of 1901 broad enough to sustain the construction we have put upon it. The two railroads are apparently within the purview of the statute of 1901. They have not the same terminal points, the southern terminus of the Detroit, Toledo & Ironton being on the Ohio river, its northern at Detroit, on the eastern shore of Michigan; the southern terminus of the Ann Arbor is at Toledo, its northern on the western shore of Michigan. The Detroit, Toledo & Ironton crosses the state line about 30 miles west of Toledo, taking a circuit of about 50 miles to reach Dundee (which is 30 miles or so north of Toledo), from which crossing the two roads run nearly at right angles to each other. The fact that the Detroit, Toledo & Ironton holds the portion of its line from Tecumseh to Dundee by terminable lease is not controlling. They are not in a proper sense competing roads; through the railroad connection at Dundee and the Ann Arbor ferry system at Frankfort a continuous line is formed between the Ohio river and the territory of the upper Great Lakes, a distance of over 600 miles, thus joining the south-bound transportation of northern iron ore with the north-bound carriage of southern coal. The only portions of the two roads permitting even a semblance of local competition is the part of the Ann Arbor between Toledo and Dundee and the portion of the Detroit, Toledo & Ironton between that place and the Michigan-Ohio line. But Dundee is not a terminal, it is a junction; and, in view of the network of railroads in the space inclosed by these portions of the two roads in question, connecting with both Toledo and Detroit, this competition would seem practically negligible. Such portions become in fact, as related to the main or through line, merely locals or branches. L. & N. Ry. Co. v. Kentucky, 161 U. S. at page 687, and following, 16 Sup. Ct. 714, 40 L. Ed. 849.

It is urged that this railroad purchase contravenes section 2 of article 19a of the Constitution of 1850, then in force, which requires at least 60 days notice of proposed railroad consolidation to be given to

all stockholders. The roads were never in fact consolidated, and there is nothing in the record action which indicates an intention to consolidate.

We conclude that the Ann Arbor purchase was authorized by the Michigan statute. We see nothing opposed to this conclusion in Mackintosh v. Flint & Pere Marquette R. R. Co. (C. C.) 34 Fed. 582, decided previous to the enactment of any Michigan statute providing for the purchase by one railroad of the completed road of another company.

The Ann Arbor purchase being authorized, the Detroit, Toledo & Ironton obviously had power to issue its mortgage bonds therefor, the statute giving the purchasing railroad express authority to—

"issue its bonds, secured by trust deed or mortgage, upon its railroad property, rights and franchises, including the property and rights thus acquired."

Such was precisely the course taken. The issuing, as a convenient method of financing, of collateral trust notes secured by the mortgage bonds and the purchased stock was not a departure from the statutory permission.

[4] Were the bonds in question properly securable under the consolidated trust mortgage? That instrument provided for issuing, to the maximum of $8,252,000, mortgage bonds, whose proceeds should be used—

"only for or in aid of the purchase or construction of extensions, branches or spurs, to the existing system of the railway company, the improvement of the terminals at Toledo or elsewhere upon the lines of the railway company, the construction of a bridge or bridges across the Ohio river * * * the construction of * * * extensions in the state of Kentucky or West Virginia or both * * * the acquisition of additional terminals * * * and such other purposes as the board of directors of the railway company may deem calculated permanently to increase the business and earning capacity of the property."

There is here no express authority for issuing bonds to pay for the purchase of railroad stocks; but if we have correctly interpreted the Ann Arbor purchase as one of a railroad property, for operation as such, the issue of the consolidated mortgage bonds would seem to be included in the broad terms "such other purposes as the board of directors of the railway company may deem calculated permanently to increase the business and earning capacity of the property," unless forbidden (as appellants contend) by the rule of ejusdem generis, on the ground that the Ann Arbor purchase is not of the same class as those which had previously been specifically enumerated. But assuming, as we must, that the Ann Arbor purchase was a railroad purchase, for purposes of railway operation, and that the railway directors did in fact, as shown by their resolution, deem such purchase "calculated permanently to increase the business and earning capacity of the property," such purchase would seem to be of the same broad general class as extensions to the existing system, improvement and acquisition of terminals, construction of bridges across the Ohio river (which would be an extension), or extensions in Kentucky and West Virginia. In our opinion, the issuing of the mortgage bonds in question was fairly authorized by the mortgage. These views as to the validity of the mort-

gage bonds relieve us from considering many interesting questions discussed by both parties.

In reaching the conclusion that the bonds issued upon the Ann Arbor purchase were validly secured by the consolidated mortgage, we of course have not considered the charge of alleged fraud as affecting the validity of the Ann Arbor purchase, because no satisfactory proof thereof has been made. Nor can appellants be heard to complain that the court below made its decision in the absence of such testimony, because appellants declined the permission given to present such proof as might be desired touching the invalidity of the bond issue as secured by the Consolidated Mortgage; and this permission was not limited to the presentation of the questions of law arising out of the statute, the mortgage and record action, individually or corporate, but must be held to have extended to all testimony, oral or otherwise, tending to establish the invalidity of the bond issue.

[5] We think also that the court was not bound to permit appellants, as a matter of right, to intervene generally for the purpose of trying out the question of liability of Hollins' & Co. to account for railroad stocks acquired in connection with the reorganization, or the liability of that firm or others for profits on the Ann Arbor purchase, or for damages on account of defaults suffered under the mortgage and collateral trust agreement. These issues were collateral to the foreclosure suits, and were not concluded by the decrees made. The court was vested with a certain amount of discretion in determining whether to permit intervention for the purposes stated; this discretion does not appear to have been improvidently exercised, and no appeal lies from the action complained of. Credits Commutation Co. v. United States, 177 U. S. 311, 314, 20 Sup. Ct. 636, 44 L. Ed. 782; Toledo, St. L. & K. C. R. R. Co. v. Continental Trust Co. (C. C. A. 6th Cir.) 95 Fed. 497, 535, 36 C. C. A. 155. So far as concerns the effect of the alleged collusive defaults upon the right to decree of foreclosure and sale, it is apparent that when the decree was made the time had actually come, rightly or wrongly, when the sale should be no longer delayed. Indeed questions relating to the time of sale and restrictions upon bidding (as well as the practical application of the damages claimed from Hollins & Co. against the value of their Detroit, Toledo & Ironton bonds and stock) have become moot, so far as this present litigation is concerned, through the foreclosure of the underlying mortgages; and it cannot rightfully be claimed that the court's refusal to permit appellants to intervene, or its delay in rejecting their persistent efforts to that end, are responsible for their failure to realize on their securities.

The decrees in Nos. 2120 and 2121 are accordingly affirmed, with costs. The appeal from the order of confirmation in No. 2145 is dismissed.