**GUARANTY TRUST CO. OF NEW YORK et al. v. MINNEAPOLIS & ST. L. R. CO. et al.**

Nos. 9147–9149.

Circuit Court of Appeals, Eighth Circuit.

Aug. 17, 1931.

See also 33 F.(2d) 512.

Warren S. Carter, of St. Paul, Minn. (Davis, Polk, Wardwell, Gardiner & Reed, of New York City, Kellogg, Morgan, Chase, Carter & Headley, of St. Paul, Minn., and Edwin S. S. Sunderland and Thomas O'G. FitzGibbon, both of New York City, on the brief), for Guaranty Trust Co. of New York, trustee.

Frederick G. Ingersoll, of St. Paul, Minn. (Larkin, Rathbone & Perry, Henry V. Poor, and James L. Banks, Jr., all of New York City, on the brief), for Central Hanover Bank & Trust Co., trustee.

Frederick F. Greenman, of New York City (Cook, Nathan & Lehman, of New York City, O'Brien, Horn & Stringer, of St. Paul, Minn., Alfred A. Cook, of New York City, Thomas D. O'Brien and Edward S. Stringer, both of St. Paul, Minn., and Arthur Kramer, of New York City, on the brief), for Bache Committee.

William Lloyd Kitchel, of New York City (Cadwalader, Wickersham & Taft, of New York City, Sanborn, Graves & Andre, of St. Paul, Minn., Eugene J. Conroy, of New York City, and William G. Graves and J. Neil Morton, both of St. Paul, Minn., on the brief), for Perkins Committee.

420

John Junell, of Minneapolis, Minn. (Junell, Oakley, Driscoll & Fletcher, of Minneapolis, Minn., and Cyril J. Curran, of New York City, on the brief), for Hawley Committee.

Wendell Berge, Sp. Asst. to Atty. Gen. (Lewis L. Drill, U. S. Atty., of St. Paul, Minn., John Lord O'Brian, Asst. to Atty. Gen., and Elmer B. Collins, Sp. Asst. to Atty. Gen., on the brief), for the United States.

White & Case, of New York City, Kingman, Cross, Morley & Cant, of Minneapolis, Minn., Jesse E. Waid, of New York City, Kenneth Taylor, of Minneapolis, Minn., and Carlos L. Israels, of New York City, for appellees New York Trust Co. and the Bennett Committee.

Before STONE and GARDNER, Circuit Judges and YOUMANS, District Judge.

GARDNER, Circuit Judge.

There are here three appeals consolidated for the purpose of presentation in this court and presented on one record. They all grow out of and are bottomed on the opinion and mandate of this court on a former appeal, which involved questions of construction and priorities of various mortgages on the railroad property of the Minneapolis & St. Louis Railroad Company. Guaranty Trust Company of New York, as Trustee, etc., v. Minneapolis & St. Louis Railroad Company et al., 36 F.(2d) 747. As noted in the opinion in that case the mortgages covering the various portions of the railroad property, the mileage included therein, the bonds authorized, and the amount of bonds actually issued are as follows:

| Mortgages | Mileage Covered | Amt. Authorized | Amt. Issued |
|---|---|---|---|
| Merriam Junction and Albert Lea, Feb. 1, 1877 | 117 | $1,100,000 | $1,100,000 |
| Minneapolis & St. Louis First Consolidated, Nov. 2, 1894 | 368 | 10,000,000 | 5,282,000 |
| Minneapolis & St. Louis First & Refunding, March 1, 1899 | 633 | 25,000,000 | 13,244,000 |
| Iowa Central First Mortgage, Aug. 1, 1888 | 503 | 7,650,000 | 7,650,000 |
| Iowa Central First & Refunding, March 1, 1901 | 539 | 25,000,000 | 7,156,000 |
| Des Moines & Ft. Dodge First Mortgage, Jan. 1, 1905 | 139 | 3,072,000 | 3,072,000 |
| Refunding and Extension Mortgage, Jan. 1, 1912 | 2090 | 75,000,000 | 8,985,000 |

On the previous appeal, the court had under consideration provisions of the last six named foregoing mortgages. The appeals here, however, involve a consideration of but three of these mortgages, and the issue is further limited to a consideration of the liens upon equipment acquired from January 1, 1912, to January 26, 1923, the date of the appointment of the receiver.

In suit No. 9147, the Guaranty Trust Company of New York, as trustee of the refunding and extension mortgage, dated January 1, 1912, has appealed from two orders of the lower court entered on the opinion and mandate of this court. The appellant, Guaranty Trust Company, upon the filing of the mandate, filed its petition to amend the final decree. The court, in denying this petition, found that the divisional mortgage which was first executed, had a prior lien on all the equipment acquired for the system since January 1, 1912; that the other divisional mortgage, executed second in point of time, had a second lien upon all of the system's equipment so acquired, and the third and last mortgage had a third lien upon such equipment. On this appeal it is urged that the refunding and extension mortgage should be a first lien upon a proportionate part of such equipment, calculated upon a first lien mileage basis, or upon some other basis of allocation, and that by reason of the replacement covenants in that mortgage, it should have a first lien upon such portion of such equipment acquired since January 1, 1912, as is necessary to maintain and replace the equipment acquired on January 1, 1912.

The court, in the original case, made no separate assignment of equipment for the lines west of Watertown, S. D., which are the only lines of the Minneapolis & St. Louis system upon which the refunding and extension mortgage is a first lien. Modifying the decree and remanding the cause to the lower court, this court directed a modification of the judgment on the record already made. The lower court was, therefore, without jurisdiction to reopen the case for the taking of additional testimony, if such existed, on this question. It is, however, claimed that on the record already made, the additional equipment could have been apportioned upon a first lien mileage basis. It must be apparent that in the present case any apportionment of equipment, based upon a mileage basis, would not be an equitable one. The mileage upon which the refunding and extension mortgage is a first lien is that portion of the system which extends west from Watertown. It is at best merely an extension, and if we may take judicial

notice of the population and importance of towns and cities located upon this branch, and can know what is a matter of common knowledge, we are warranted in the conclusion that the density of traffic upon this portion of the line is very small as compared with the traffic upon other portions of the system. Such an apportionment would certainly not be equitable. It is now claimed, however, that a proportion of the equipment acquired subsequent to January 1, 1912, should be allocated to this mortgage, based upon the replacement covenants therein. Appellant, neither in the trial of the original action, nor on the former appeal, asserted any right or claim under any alleged replacement covenants in its mortgage; in fact, it denied that the replacement covenants of the Iowa Central first mortgage had such effect, and its contention throughout this litigation and until the mandate issued, has been inconsistent with any such contention. We think it cannot now be heard to urge such a claim. It would require the reopening of the record and reframing of the issues, and retrial of the case. The orders attacked on this appeal are, therefore, affirmed.

The appeal in No. 9148 is by the Central Hanover Bank & Trust Company as trustee of the first and refunding mortgage of the Iowa Central Railway Company. This court on the former appeal held that the Iowa Central first mortgage contained no after-acquired property clause, but that it contained replacement clauses making that mortgage a first lien upon a value amount of equipment acquired by the Iowa Central, or its successors, equal to the value amount of equipment in existence at the date of its execution. We also held that the Minneapolis & St. Louis first and refunding mortgage and the Iowa Central first and refunding mortgage both contained after-acquired property clauses, which were not cut off, either by the 1912 sale or the 1916 consolidation.

The lower court, on motion of the Perkins committee, representing the Minneapolis & St. Louis first and refunding mortgage bondholders, amended the original final decree of foreclosure so as to declare that that mortgage was a first lien on all equipment acquired after January 1, 1912, prior to the lien of the Iowa Central first and refunding mortgage, and so as to declare the lien of the Iowa Central first and refunding mortgage a second lien thereon.

The Bache committee, representing the holders of bonds secured by the Iowa Central first and refunding mortgage, challenge the correctness of the lower court's decision in so modifying the decree and in denying their application to apportion the equipment to each of these mortgages. The question presented on this appeal is, therefore, whether the lien of the Minneapolis & St. Louis first and refunding mortgage is prior to that of the Iowa Central first and refunding mortgage on equipment acquired between January 1, 1912, and the date of the receivership. While this court, on the former appeal, held that the after-acquired property clauses of both of these mortgages survived the closure agreements of 1912 and the consolidation of 1916, it did not, in its attempt to unravel the tangled skein then presented, consider the question of priority. The question has been presented with great skill and marked ability by counsel on either side, but even the industry of distinguished counsel has not been able to present any direct precedents which may guide us in the determination of this question.

The after-acquired property clause of the Minneapolis & St. Louis mortgage was an obligation and covenant created by that company in 1899. The after-acquired property clause in the Iowa Central first and refunding mortgage was an obligation and covenant created by that company in 1901. When the Minneapolis & St. Louis Railroad Company purchased the Iowa Central Company, it for the first time, covenanted and agreed to carry out the obligations of that company, created by its mortgage. Its bondholders were, of course, not parties to that agreement. The contract created a personal obligation on the part of the Minneapolis & St. Louis Company toward the Iowa Central bondholders, and, as above noted, it became such an obligation at the time of its contract of purchase, January 1, 1912. The obligation of the company under its own mortgage was created in 1899, so that when that company purchased the Iowa Central Company, it was already obligated, by reason of its prior contract, to subject all after-acquired equipment to the lien of its own mortgage. As to the property acquired subsequent to January 1, 1912, both of these obligations were executory, and so far as the separate contracts are concerned, it may be assumed that each was specifically enforcible. This being true, we are of the view that the prior obligation should prevail. McGinn v. Wiley, 24 Cal. App. 303, 141 P. 49; Thistle Mills Co. v. Bone, 92 Md. 47, 48 A. 37; Pomeroy Equity Jurisprudence (4th Ed.) § 756.

At the time the Minneapolis & St. Louis Company contracted for the purchase of the

Iowa Central Company and agreed to assume and carry out the obligations and covenants of that company's mortgage, including the covenant that the lien of the mortgage should attach to after-acquired property, it had already contracted away this property right and could not, as against its own mortgagee and bondholders, by a subsequent contract, deprive them of their contract lien. We are, therefore, of the view that the lower court properly held that the lien of the Minneapolis & St. Louis first and refunding mortgage on the property acquired subsequent to January 1, 1912, was prior to the lien of the Iowa Central first and refunding mortgage on the same property.

It remains to consider the appeal of the Hawley committee in No. 9149. This committee represents holders of bonds secured by the refunding and extension mortgage, supra, executed January 1, 1912. This committee, on August 25, 1930, filed with the lower court its motion for permission to file its petition for leave to intervene. In support of this petition, it alleged that the United States of America held as pledgee an aggregate of $2,495,000 of bonds issued under this mortgage, which had been pledged without the authorization of the Interstate Commerce Commission, under section 20a of the Interstate Commerce Act (49 USCA § 20a); that upon prior appeals to this court the committee had been permitted to intervene on May 6, 1929, but this court on December 24, 1929, dismissed its intervention. The petition filed in the lower court on August 25, 1930, asked leave to move to reopen the proceedings, for the purpose of introducing evidence bearing upon the question of the invalidity of the bonds held by the United States. This petition was denied by the lower court, and it is from that order that the Hawley committee prosecutes this appeal.

The government has filed brief in resistance of the committee's contentions, and brief has also been filed on behalf of the New York Trust Company and the Bennett committee.

■ We held on the former appeal that this committee had been guilty of laches, and it has not purged itself of that charge. This railroad went into the hands of a receiver on July 26, 1923, and final decree of foreclosure and sale was entered in January, 1929. A special master was appointed in April, 1925, and ancillary proceedings were instituted in the Southern District of New York, which seems to be the residence of the Hawley committee. A special master was appointed in that district to take depositions in the state of New York. After many hearings, pursuant to public notice issued from time to time, the testimony of all claimants, including the Guaranty Trust Company of New York, trustee of the mortgage under which the bonds held by the Hawley committee and the government were issued, was heard by the special master. His report was rendered August 13, 1928. During the entire period of this receivership, some six years, while the matter was pending in the lower court, the bondholders represented by the committee, took no steps to assert the claim which they now seek to interpose. It is true that it is claimed that it was not until April 20, 1929, that the facts upon which it bases its claim were discovered, but the mere failure and neglect of the committee to employ counsel until after final decree had been entered furnishes no excuse for its negligence and delay in seeking to protect its alleged rights. The right to intervene must be exercised in subordination to and in recognition of the propriety of the main proceeding. It is a matter of right only where the petitioner, not being already fairly represented, is asserting a right which would be lost or substantially affected if intervention were denied. Generally, intervention is a matter of sound legal discretion. exercised under well-recognized judicial standards in the interest of justice. Equity Rule 37 (28 USCA § 723); Whittaker v. Brictson Mfg. Co. (C. C. A.) 43 F.(2d) 485; United States v. California Canneries, 279 U. S. 553, 49 S. Ct. 423, 73 L. Ed. 838. And, ordinarily, the right of intervention is discretionary. Credits Commutation Co. v. United States, 177 U. S. 311, 20 S. Ct. 636, 44 L. Ed. 782; Lisman v. Knickerbocker Trust Co. (C. C. A.) 211 F. 413, 423.

In Lisman v. Knickerbocker Trust Co., supra, the parties seeking intervention were bondholders who sought to intervene in a foreclosure. The lower court refused the application, and on appeal the court said inter alia: "The court was vested with a certain amount of discretion in determining whether to permit intervention for the purposes stated; this discretion does not appear to have been improvidently exercised, and no appeal lies from the action complained of."

■ Because of the laches here disclosed, the lower court was warranted in denying the petition to intervene. But if we put aside these insuperable barriers, still we think this committee was not entitled to intervene. The petition itself does not allege any facts war-

ranting intervention. It is not alleged that the trustee of their mortgage had been guilty of any neglect or fraud, nor that he represented any financial interest opposed to the bondholders represented by the committee. Palmer v. Bankers' Trust Co. (C. C. A.) 12 F.(2d) 747.

■ But quite aside from this, we are of the view that where bonds were pledged to the government, as these were, the statute requiring the approval of the Interstate Commerce Commission was not applicable. These bonds were authenticated prior to May 24, 1917, whereas, the Transportation Act under which the committee claims that it was necessary that they have the approval of the Interstate Commerce Commission, was not enacted until 1920. It is, however, contended that while the bonds were authenticated prior to the enactment of the Transportation Act, they were not issued within the provision of that act until pledged, which, confessedly, was after the passage of the Transportation Act. These bonds were pledged under the provisions of sections 207 and 210 of the Transportation Act of 1920. Section 207 provided for the funding of any indebtedness of carriers to the United States. Section 210 provided for loans by the United States to carriers, to meet maturing indebtedness, and to provide for additions and betterments. Section 207 (b) provides that the carrier "shall give, in the discretion of the President, such security, in such form and upon such terms, as he may prescribe."

Section 210, as amended by Act June 5, 1920, c. 235, § 5, 41 Stat. 946, provides that the Commission shall prescribe the security which the carrier shall give for loans under that section, and that the Secretary of the Treasury shall "accept the security prescribed therefor by the commission." Subsection (g) of section 207 provides that: "A carrier may issue evidences of indebtedness pursuant to this section without the authorization or approval of any authority, State or Federal, and without compliance with any requirement, State or Federal, as to notification." Subsection (f) of section 210 provides that: "A carrier may issue evidences of indebtedness to the United States pursuant to this section without the authorization or approval of any authority, State or Federal, and without compliance with any requirement, State or Federal, as to notification."

If, therefore, the bonds were issued when pledged, such issuance did not require the approval of the Interstate Commerce Commission, as such approval is expressly declared to be unnecessary by section 207 (g) and section 210 (f). If we construe these sections in connection with section 20a of the Interstate Commerce Act, it seems plain that the general provision for approval of security by the Interstate Commerce Commission, referred to in section 20a, must give way to the specific exemptions from approval, contained in sections 207 (g) and 210 (f), supra. If not so construed, these latter sections become inoperative. Again, it seems clear that the Commission, acting under authority of section 210, issued its certificate No. 81 to the Secretary of the Treasury on March 28, 1921, certifying that a loan in the amount of $1,382,000 should be made and secured by the bonds bearing the numbers therein specified. On March 31, 1921, the Commission amended its certificate, to the effect that the loan should be secured by bonds numbered 5243 to 5398, inclusive, and 5963 to 8182, inclusive. The bonds so designated by the Commission to be pledged as security for the loan include those aggregating the $995,000 now in question.

■ It is also pointed out that in equipment notes of Minneapolis & St. Louis Railroad, 70 I. C. C. 67, the Commission authorized the carrier to assume liability as endorser or guarantor of notes executed by the government for an equipment loan under section 210, and expressly authorized the railway company to pledge to the government $1,500,000 of bonds here involved as security for the equipment notes, subject to the existing pledge thereof with the Secretary of the Treasury, under section 207 of the Transportation Act of 1920. Now, no other construction could be given the Commission's act of designating the $995,000 of bonds as part security for the loan, than as its authority to pledge those particular bonds, so that even if the first pledge of $1,500,000 of bonds was without authority, still the second pledge, being expressly authorized, subject to the government's right under the first pledge, recognized the validity of the first pledge and constituted the Commission's authorization for such pledge.

It follows that in no view of the committee's application should intervention have been allowed, and there is no merit in the appeal of the Hawley committee. The orders appealed from in each of these appeals should be and are affirmed.